**EXHIBIT A**

## U.S. State Supreme Court
## Recusal Rules and Practices

| STATE | Recusal Rules/Statutes | Does rule require recusal for "appearance of impropriety"? | Do other justices vote? |
|---|---|---|---|
| ALABAMA | Canon 3C; Code of Ala § 12-24-1 and 12-24-2 | The statutory provisions require recusal for campaign contributions above a specified amount absent waiver and state the legislative intent is to avoid an "appearance of impropriety." The statute contains objective thresholds regarding what constitutes such an appearance. | The clerk states that other justices could vote but that it has never happened. No written rule exists regarding this practice. |
| ALASKA | Canon 3E; AS 22.20.020 | NO | The clerk indicates that AS 22.20.020 allows other justices to appoint a judge to review a justice's recusal declination but that it has never happened. |
| ARIZONA | Canon 3E(4) | NO | NO |
| ARKANSAS | Supreme Court Rule 6-4; Canon 2.11 | NO | NO |
| CALIFORNIA | Canon 3E(4) | NO | NO |
| COLORADO | Canon 3(C); CRCP 97 | NO | NO |
| CONNECTICUT | Code of Judicial Conduct Canon 3C; Conn. Practice Book 1-22 | NO | NO |
| DELAWARE | Code of Judicial Conduct, Canon 3; Rule 2.11 | NO | NO |
| FLORIDA | Code of Judicial Conduct, Canon 3E, [R Jud. Admin. 2.330 is for trial judges] | NO | NO |
| GEORGIA | OGCA, sect. 15-1-8; Code of Judicial Conduct Canon 3E | NO | NO |
| HAWAII | Code of Judicial Conduct; Rule 2.11 | NO | NO |
| IDAHO | Canon 3E [Court Rule 40(d) doesn't apply to justices] | NO | NO |
| ILLINOIS | Supreme Court Rule 63 (IL Code of Judicial Conduct Canon 3) | NO | NO |
| INDIANA | IN Code of Judicial Conduct Rule 2.11 | NO | NO |
| IOWA | IA R 51.Canon 3(C) | NO | NO |
| KANSAS | KS Rules Relating to Judicial Conduct Rule 2.11 | NO | NO |
| KENTUCKY | SCR 4.300 KY Code of Judicial Conduct, Canon 3(E); KRS 26A.015 (statute) | NO | NO |

**EXHIBIT A**

U.S. State Supreme Court
Recusal Rules and Practices

Michigan Supreme Court
Justice Maura Corrigan
Research as of 1/11/10
page 2

| STATE | Recusal Rules/Statutes | Does rule require recusal for "appearance of impropriety"? | Do other justices vote? |
|---|---|---|---|
| LOUSIANA | Code of Judicial Conduct Canon 3(C); Code of Civ Pro, art. 151, 152, 159; Code of Crim Pro 671, 672; Supreme Court Rules Part L, Rule XXXVI (Civ Pro and Crim Pro rules are enacted by the Legislature) | NO | YES. If challenged justice decides not to recuse, remaining justices vote. Code of Civ Pro art. 159; Code of Crim Pro art. 679 |
| MAINE | Maine Code of Judicial Conduct Canon 3(E) | NO | NO |
| MARYLAND | Md Rule 16-813, Maryland Code of Judicial Conduct Canon 3(D) | NO | NO |
| MASSACHUSETTS | Supreme Judicial Court Rule 3:09, Mass Code of Judicial Conduct, Canon 3(E) | NO | NO |
| MINNESOTA | 52 Minn Statutes Annotated, Code of Jud.Conduct, Canon 3(D) | NO | NO |
| MISSISSIPPI | Miss R App Pro 48(B) for trial judges, and Miss R App Pro 48(C) for disqualifiation of justices or judges of appellate courts | NO | YES. Miss R App Pro 48(C)(a)(iii). |
| MISSOURI | Supreme Court Rule 2.03, Canon 3(E) | NO | YES. Clerk said that other justices could vote based on the court's unwritten policy for handling recusals, but the clerk was unaware of any time in which justices actually voted on the recusal of a co-equal justice. |
| MONTANA | Mont CA § 3-1-803; Mont CJC Rule 2.12 | NO | NO |
| NEBRASKA | Neb CR § 5-203(E) | NO | NO |
| NEVADA | Nev RS 1.225 | NO | YES. Nev RS 1.225. |
| NEW HAMPSHIRE | NH Sup Ct R 38-3(E) | NO | NO |
| NEW JERSEY | NJ CR 1:12-1 | NO | NO |
| NEW MEXICO | NM Const art 6, § 18; NM CR 21-400 | NO | NO |
| NEW YORK | NY CR 100.3(E) | NO | NO |

**EXHIBIT A**

U.S. State Supreme Court
Recusal Rules and Practices

Michigan Supreme Court
Justice Maura Corrigan
Research as of 1/11/10
page 3

| STATE | Recusal Rules/Statutes | Does rule require recusal for "appearance of impropriety"? | Do other justices vote? |
|---|---|---|---|
| NORTH CAROLINA | Judicial Canon 3C(1) | NO | NO. Other justices never vote on recusal. But a party aggrieved by a justice's refusal to recuse could bring it before the judicial standards commission. If the commission recommended removal or censure, that would go before the other justices. And the Chief Justice could remove the case from the S Ct to the COA. But the clerk never remembers that happening or there ever having been an issue. |
| NORTH DAKOTA | ND Code of Judicial Conduct Canon 3E(1) | NO | NO |
| OHIO | Ohio Code of Judicial Conduct 2.11; OH Const. Art. IV, sect 5(C) | NO | NO |
| OKLAHOMA | Code of Judicial Conduct Canon 3E (current)/ R. 2.11 (new proposed); Title 20 OK St. Sect. 1402 | NO | Justices generally decide for themselves but in OK the Chief Justice's brother is the AG. In a few case involving the AG's office, the Chief Justice has asked a motion for DQ/recusal to be considered at the justices' conference. Also, when a (usually pro se) litigant asks for DQ of entire S Ct that of course is considered by full court. |

**EXHIBIT A**

U.S. State Supreme Court
Recusal Rules and Practices

Michigan Supreme Court
Justice Maura Corrigan
Research as of 1/11/10
page 4

| STATE | Recusal Rules/Statutes | Does rule require recusal for "appearance of impropriety"? | Do other justices vote? |
|---|---|---|---|
| OREGON | Code of Judicial Conduct JR 2-106; ORS 14.275, 14.210; ORAP 8.30 | NO | YES. If a justice does not believe the motion to DQ is well taken, the justice shall refer the motion to the chief justice, who may rule on the motion or may refer the motion to the full court for a decision. ORAP 8.30. In practice, justices tend to DQ themselves liberally and this is not usually an issue. The S Ct did go through this process ("went through the motions") of bringing a DQ motion before the full court where a pro se litigant filed a completely baseless motion to DQ a justice. |
| PENNSYLVANIA | Code of Judicial Conduct Canon 3C; Conn. Practice Book 1-22 | NO | NO. |
| RHODE ISLAND | RI Code of Judicial Conduct Canon 3(E) | NO | NO. Although the challenged justice may choose to dicuss it with the Court. The clerk had never heard of the Court disagreeing with a challenged justice's decision or of a vote by the unchallenged justices. |
| SOUTH CAROLINA | SC Code §§ 14-1-130, 14-3-50; SC Code of Judicial Conduct Canon 3(E) | NO | NO. Although the challenged justice could seek input from the Court. Maybe the Court could act if they disagreed with the justice's decision, but the Clerk had never seen this happen. |
| SOUTH DAKOTA | SD Code 15-12-37; Code of Judicial Conduct 3(E) | NO | NO |
| TENNESSEE | TN Const art VI, § 11; TN R Sup Ct 10-3(E) | NO | NO, according to the rules. As yet unable to get phone confirmation re: whether might be an informal practice. |

**EXHIBIT A**

U.S. State Supreme Court
Recusal Rules and Practices

Michigan Supreme Court
Justice Maura Corrigan
Research as of 1/11/10
page 5

| STATE | Recusal Rules/Statutes | Does rule require recusal for "appearance of impropriety"? | Do other justices vote? |
|---|---|---|---|
| TEXAS | Const art 5, sec 11; Rule 18b; informal Supreme Court voting practice | NO | YES. No written rule, but their Supreme Court Rules attorney confirms that the remaining justices vote if there is a motion to recuse one justice and he decides not to recuse himself. |
| UTAH | UT Code 78A-2-222; UT Code of Judicial Conduct Canon 3(E) | NO | NO, according to the rules. As yet unable to get phone confirmation re: whether might be an informal practice. |
| VERMONT | 12 Vt SA § 61 and Vt Code J Conduct Canon 3(E) and Vt R App Pro, Rule 31(d)-(e) | NO | YES. If challenged justice decides not to disqualify himself, quorum of remaining justices vote. Vt R App Pro, Rule 31(e). |
| VIRGINIA | VA Sup Ct R 6:3-3(E) | NO | NO |
| WASHINGTON | RC Wash 2.28.030 and Wash CJC 2(D) | NO | NO |
| WEST VIRGINIA | W Va R of App Proc 29(b) and Code of J Conduct 3(E)(1) | NO | NO |
| WISCONSIN | Wis CL § 757.19 | NO | NO |
| WYOMING | Wy R Civ P 40.1(b)(2) and Wy R J Cond 2.11 | NO | NO |

# Order

November 25, 2009

Marilyn Kelly,
Chief Justice

Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway,
Justices

ADM File No. 2009-04

Amendment of Rule 2.003
of the Michigan Court Rules

On order of the Court, notice of the proposed changes and an opportunity for comment in writing and at a public hearing having been provided, and consideration having been given to the comments received, the following amendments of Rule 2.003 of the Michigan Court Rules are adopted, effective immediately.

[Additions are indicated by underline, and deletions by strikethrough.]

Rule 2.003    Disqualification of Judge

(A)    Applicability.  This rule applies to all judges, including justices of the Michigan Supreme Court, unless a specific provision is stated to apply only to judges of a certain court.  The word "judge" includes a justice of the Michigan Supreme Court.

(BA)  Who May Raise.  A party may raise the issue of a judge's disqualification by motion, or the judge may raise it.

(CB)  Grounds.  A judge is disqualified when the judge cannot impartially hear a case, including but not limited to instances in which:

  (1)    Disqualification of a judge is warranted for reasons that include, but are not limited to, the following:

    (a1)   The judge is personally biased or prejudiced for or against a party or attorney.

    (b)    The judge, based on objective and reasonable perceptions, has either (i) a serious risk of actual bias impacting the due process rights of a

party as enunciated in *Caperton v Massey*, __US__ ; 129 S Ct 2252; 173 L Ed 2d 1208 (2009), or (ii) has failed to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct.

(c2) The judge has personal knowledge of disputed evidentiary facts concerning the proceeding.

(d3) The judge has been consulted or employed as an attorney in the matter in controversy.

(e4) The judge was a partner of a party, attorney for a party, or a member of a law firm representing a party within the preceding two years.

(f5) The judge knows that he or she, individually or as a fiduciary, or the judge's spouse, parent, or child wherever residing, or any other member of the judge's family residing in the judge's household, has ~~an~~ more than a de minimis economic interest in the subject matter in controversy that could be substantially impacted by the proceeding. ~~or in a party to the proceeding or has any other more than de minimis interest that could be substantially affected by the proceeding.~~

(g6) The judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

    (ia) is a party to the proceeding, or an officer, director, or trustee of a party;

    (iib) is acting as a lawyer in the proceeding;

    (iiic) is known by the judge to have a more than de minimis interest that could be substantially affected by the proceeding; or

    (ivd) is to the judge's knowledge likely to be a material witness in the proceeding.

(2) Disqualification not warranted.

(a) A judge is not disqualified merely because the judge's former law clerk is an attorney of record for a party in an action that is before the judge or is associated with a law firm representing a party in an action that is before the judge.

(b) A judge is not disqualified based solely upon campaign speech protected by *Republican Party of Minn v White*, 536 US 765 (2002), so long as such speech does not demonstrate bias or prejudice or an appearance of bias or prejudice for or against a party or an attorney involved in the action.

(D̶C̶) Procedure.

(1) *Time for Filing.* To avoid delaying trial and inconveniencing the witnesses, a motion to disqualify must be filed within 14 days after the moving party discovers the ground for disqualification. If the discovery is made within 14 days of the trial date, the motion must be made forthwith. If a motion is not timely filed, untimeliness, including delay in waiving jury trial, is a factor in deciding whether the motion should be granted.

(2) *All Grounds to Be Included; Affidavit.* In any motion under this rule, the moving party must include all grounds for disqualification that are known at the time the motion is filed. An affidavit must accompany the motion.

(3) *Ruling.*

(a) For courts other than the Supreme Court, T̶the challenged judge shall decide the motion. If the challenged judge denies the motion,

(i̶a̶) in a court having two or more judges, on the request of a party, the challenged judge shall refer the motion to the chief judge, who shall decide the motion de novo;

(ii̶b̶) in a single-judge court, or if the challenged judge is the chief judge, on the request of a party, the challenged judge shall refer the motion to the state court administrator for assignment to another judge, who shall decide the motion de novo.

(b) In the Supreme Court, if a justice's participation in a case is challenged by a written motion or if the issue of participation is raised by the justice himself or herself, the challenged justice shall decide the issue and publish his or her reasons about whether to participate.

If the challenged justice denies the motion for disqualification, a party may move for the motion to be decided by the entire Court.

The entire Court shall then decide the motion for disqualification de novo. The Court's decision shall include the reasons for its grant or denial of the motion for disqualification. The Court shall issue a written order containing a statement of reasons for its grant or denial of the motion for disqualification. Any concurring or dissenting statements shall be in writing.

(4) ~~Motion Granted~~ _If Disqualification Motion is Granted_.

    (a) For courts other than the Supreme Court, ~~w~~When a judge is disqualified, the action must be assigned to another judge of the same court, or, if one is not available, the state court administrator shall assign another judge.

    (b) In the Supreme Court, when a justice is disqualified, the underlying action will be decided by the remaining justices of the Court.

(~~E~~D) ~~Remittal~~ Waiver of Disqualification. ~~If it appears that there may be grounds for disqualification, the judge may ask the parties and their lawyers to consider, out of the presence of the judge, whether to waive disqualification. If, following disclosure of any basis for disqualification other than personal bias or prejudice concerning a party, the parties without participation by the judge, all agree that the judge should not be disqualified, and the judge is then willing to participate, the judge may participate in the proceedings. The agreement shall be in writing or placed on the record.~~ Parties to the proceeding may waive disqualification even where it appears that there may be grounds for disqualification of the judge. Such waiver may occur whether the grounds for disqualification were raised by a party or by the judge, so long as the judge is willing to participate. Any agreement to waive disqualification must be made by all parties to the litigation and shall be in writing or placed on the record.

KELLY, C.J. (_concurring_).

I voted for this recusal rule and write to discuss it and respond, in part, to the criticism leveled against it.

In adopting this rule, the Michigan Supreme Court has, for the first time in its long history, reduced to writing a rule to govern when a justice should not vote on a case. In the past, the justices wrote rules on recusal but applied them to other judges only, not to themselves.

Some of us have long believed that the interests of the legal community and of the general public are best served if a Supreme Court recusal rule is put in writing. In that

way, all can see and understand something that has long been shrouded in mystery: how recusal works in the Michigan Supreme Court.

Curiously, until recently, it was generally unknown that, when a motion to recuse was filed, only the justice at whom it was directed acted on it. The Court then issued an order that appeared to be an action of all the justices. Typically, no reason was given to the petitioner or the public if the request to recuse was denied. Also, no procedure existed to permit the party seeking a justice's recusal to obtain a vote of the other justices if the motion was denied.

Important to this discussion is the fact that, this year, the United States Supreme Court rendered its decision in the case of *Caperton v A.T. Massey Coal Co, Inc.*[1] It reversed an order of the West Virginia Supreme Court in which a justice there refused to recuse himself following a procedure similar to that long used by the Michigan Supreme Court. The Court found that the party seeking the justice's recusal had been deprived of his constitutional right to due process. This was partly because, the Court found, a justice's decision on his or her own recusal is inherently subjective. But, the due process clause requires an objective decision.[2]

I read *Caperton* to mean that an independent inquiry into a challenged justice's refusal to recuse may be necessary to satisfy due process because the independent inquiry makes possible an objective decision. That independent inquiry has been written into Michigan's new rule where it allows the party requesting recusal to seek a vote on the motion by the entire court.

Those of us supporting Michigan's new rule believe that the situation that gave rise to the *Caperton* case should not be allowed to take place in this state. For that reason, together with the obvious need for increased clarity and understanding about our recusal procedures, we have voted for this rule.

I have read Justice Young's and Justice Corrigan's statements that accompany this order. I quite agree with them that the order must not be applied to curtail fundamental freedoms. I have not heard any of the justices who favored the order suggest that it will be used "to prevent judicial candidates from speaking their minds" or to prevent "the voters [from electing] judges of their choosing." I know of nothing that would reasonably lead one to believe that the order will be used to permit "duly elected justices

---

[1] ___ US ___; 129 S Ct 2252; 173 L Ed 2d 1208 (2009). Since *Caperton* was decided, the Wisconsin Supreme Court amended its recusal rule in response. *See Wisconsin Supreme Court Rule Petitions 08-16, 08-25, 9-10, and 9-11* (acted upon October 28, 2009). Michigan is not the first state to react with a rule change.

[2] *Caperton, supra* at 2263.

[to deprive] their co-equal peers of their constitutionally protected interest in hearing cases." And it seems an outrageous stretch of credulity to suggest that "starting today, those contesting traffic tickets will enjoy greater constitutional protections than justices of this Court."

In suggesting that no precedent exists for a judge to be removed from a case against his or her will, Justice Corrigan and Justice Young forget this: under our existing rules,[3] trial judges are removed from cases against their will in our courts every day and have been for years. Unanswered in their statements is the question: Why should trial judges be subject to having their decisions not to recuse themselves reversed by their peers while justices are insulated from the same treatment?

With respect to the constitutional arguments posed by Justices Corrigan and Young, it should be noted that these arguments were made only at the eleventh hour. The parts of the rule that they attack have been actively before the Court for more than a year. If any serious treatment of them was intended, it would seem it would have been put forth well before the rule was voted on.

As Justice Weaver has pointed out in her statement, the decision to adopt this rule has been anything but "hasty," notwithstanding the assertions of Justices Corrigan and Young. In fact, the rule has received the Court's constant vision and revision, particularly during the last year. The normal procedure for rule adoption has been followed, including public comment and public hearing.

Justice Young belatedly raises numerous constitutional challenges to the rule. Certainly, the Court can and, no doubt, will discuss them in due time. There has been no decision to refuse to place Justice Young's proposals on the conference agenda. Suffice it to say that the rule in no way prevents the United States Supreme Court from reviewing a recusal decision made by our Court, as he apparently fears.

No factual basis exists on which to ground the insinuation that those who voted for this rule will use it to remove a justice from a case for improper reasons. No facts have been shown to support this assertion. None exist. Justice Markman's fears of "gamesmanship" and "politicization" in the Court's future handling of recusal motions

---

[3] MCR 2.003(C)(3). If the challenged judge denies the motion to recuse, in a court having two or more judges, the chief judge may reverse the decision and require recusal. In a single-judge court or if the challenged judge is the chief judge, the state court administrator may assign the decision to another judge who may overturn the refusal to recuse.

arise only from his imaginings. Whether there will be further "acrimony" lies, in part, in the hands of each justice.

Moreover, it is a gross perversion of law for Justice Corrigan to allege that, "In one administrative order [the recusal rule], the majority takes away the right of every citizen of Michigan to have his or her vote count." The accurate statement is, with this rule, the Court permits a justice's recusal where that justice is unable to render an unbiased decision and unable or unwilling to acknowledge that fact. The justice system and this Court can only be stronger for it.

CAVANAGH, J. (*concurring*). The process by which justices are disqualified from hearing a case before this Court is not merely a theoretical matter. The disqualification process has very real consequences for the parties who seek justice from this Court, as well as the public at large. Our current practice provides no avenue to redress a decision by a justice who refuses to disqualify himself, no matter how much evidence is produced that the justice is indeed actually biased.

If my dissenting colleagues truly believe that our current practice is the best for Michigan's citizens, then they should have no problem explaining their rationale to the public and hearing the public's assessment of this rationale. However, I believe they know that there is no reasonable justification that can be proffered for allowing a justice accused of bias to be the only one who decides whether he should be disqualified, other than "we have always done it this way." I can think of no reasonable explanation that would be acceptable to the public for maintaining this procedure because it is apparent that it is incongruous with reason. This is especially true in light of the fact that Michigan's own court rules—adopted by *this Court*—govern disqualifications for all other judges and explicitly provide the recourse of having the denial of a disqualification motion reviewed by another judge. See MCR 2.003(C)(3). Remarkably, the majority believes that members of this Court are above the same rules that it has adopted to apply to *all other judges in the state*.

Weaver, J. (*concurring*). At last this Court has adopted clear, fair, written disqualification rules for Michigan Supreme Court justices.[4]

---

[4] This concurring statement is submitted November 24, 2009 at approximately 3:20 p.m. and although other justices have indicated a desire to submit concurring and dissenting statements, no other statements have been submitted as yet. Because the order is scheduled for entry on November 25, Thanksgiving Eve, there will not be a reasonable opportunity to respond to subsequently submitted statements. If any response to statements submitted hereafter is necessary, my response will be submitted to the Court on a date after Thanksgiving for the Court to file and distribute to the public, and will also be posted on my personally funded website: **justiceweaver.com**.

This newly amended rule is a positive, historical step forward toward achieving more transparency and fairness in the Michigan Supreme Court. The amended rule provides a fair disqualification process to ensure that the parties appearing before the Court have justices deciding their cases that are not actually biased, nor objectively appear to be biased. It does so in a transparent process by requiring a justice challenged by a party to submit his or her decision and reasons in writing regarding his or her recusal decisions and requiring the Court—the remaining justices—if requested by a party to review the challenged justice's decision and to publish the remaining justices' decision and reasons in writing. This process, of written decision and with written reasons, is fair to the parties and to the challenged justice. It provides the public with more knowledge of how the justices conduct the people's judicial business.

I concur in this Court's adoption of such rules, but write separately to inform the parties in pending cases and the public of the improper delay and procedure concerning entry of this order adopting the amendment and its effective date.

Since May 2003, I have repeatedly called for this Court to recognize; publish for public comment; place on a public hearing agenda; and address the need to have written, clear, fair, orderly, and public procedures concerning the participation or disqualification of justices.[5]

On November 5, 2009, this Court finally adopted rules for disqualification of justices by amending Michigan Court Rule (MCR) 2.003—Disqualification of Judge. At our regularly scheduled public administrative conference, Justice Hathaway moved for the adoption of amendments to that court rule. The motion was seconded by Chief

---

[5] See, e.g., the statements or opinions by Weaver, J., in *In re JK*, 468 Mich 202, 219 (2003); *Gilbert v DaimlerChrysler Corp*, 469 Mich 883 (2003); *Advocacy Org for Patients & Providers v Auto Club Ins Ass'n*, 472 Mich 91 (2005); *McDowell v Detroit*, 474 Mich 999, 1000 (2006); *Stamplis v St John Health Sys*, 474 Mich 1017 (2006); *Heikkila v North Star Trucking, Inc*, 474 Mich 1080 (2006); *Lewis v St John Hosp*, 474 Mich 1089 (2006); *Adair v Michigan*, 474 Mich 1027, 1044 (2006); *Grievance Administrator v Fieger*, 476 Mich 231, 328 (2006); *Grievance Administrator v Fieger*, 477 Mich 1228, 1231 (2006); *People v Parsons*, 728 NW2d 62 (2007); *Ruiz v Clara's Parlor Inc*, 477 Mich 1044 (2007); *Neal v Dep't of Corrections*, 477 Mich 1049 (2007); *State Auto Mut Ins Co v Fieger*, 477 Mich 1068, 1070 (2007); *Ansari v Gold*, 477 Mich 1076, 1077 (2007); *Short v Antonini*, 729 NW2d 218 (2007); *Flemister v Traveling Med Services, PC*, 729 NW2d 222, 223 (2007); *McDowell v Detroit*, 477 Mich 1079, 1084 (2007); *Johnson v Henry Ford Hosp*, 477 Mich 1098, 1099 (2007); *Tate v City of Dearborn*, 477 Mich 1101, 1102 (2007); *Dep't of Labor & Economic Growth v Jordan*, 480 Mich 869 (2007); *Cooper v Auto Club Ins Ass'n*, 739 NW2d 631 (2007); and *Citizens Protecting Michigan's Constitution v Secretary of State and Reform Michigan Government Now! (RMGN)*, 482 Mich 960 (2008).

Justice Kelly and Justice Weaver, and the motion was adopted by a vote of 4-to-3,[6] with the understanding that Justice Young and Justice Hathaway would possibly offer an amendment to MCR 2.003(D)(1) (Time for Filing) that might be proposed at the next, or a future, public administrative conference for discussion and vote. The only portion of Justice Hathaway's proposed revision that was not adopted on November 5, 2009 was her proposed amendment to Subsection (C)(1) (Time for Filing), which remains and is re-designated now as MCR 2.003(D)(1). By adopting an amendment to MCR 2.003—Disqualification of Judge—this Court has finally established clear, written, and fair rules governing the disqualification of justices on the Michigan Supreme Court.

"Immediate effect" of the amendment to MCR 2.003—Disqualification of Judge—that had just been adopted was established by a 4-to-3 vote on motion by Justice Cavanagh,[7] seconded by Justice Weaver. "Immediate effect" was necessary because there were already two cases with pending motions for disqualification against various justices. One of these pending cases, *Pellegrino v Ampco Systems Parking*, Docket No. 137111, was a case that had originally been scheduled for oral argument on November 3, 2009, but was adjourned because it was anticipated that adoption of clear written disqualification rules would occur at the November 5, 2009 public administrative conference.[8]

Incredibly, although "immediate effect" was given to the amendment of MCR 2.003 on November 5, the order informing the public of the rule change did not enter on that date or promptly thereafter. Instead it is finally being entered 20 days later on November 25, 2009.[9] This Court should not have delayed issuing the order for any amount of time.[10]

---

[6] Voting for adoption of the motion were Chief Justice Kelly and Justices Cavanagh, Weaver, and Hathaway. Voting against the motion were Justices Corrigan, Young, and Markman.

[7] Voting for the motion were Chief Justice Kelly and Justices Cavanagh, Weaver, and Hathaway. Voting against the motion were Justices Corrigan, Young, and Markman.

[8] The discussion and possible adoption of disqualification rules had been passed at Justice Young's request and removed from the October 8, 2009 public administrative conference because Justice Young wanted to participate in the discussion, but he was unavailable for that properly noticed public administrative conference.

[9] As a result, apparently when the Michigan Supreme Court says that something has "immediate effect," that is not the case in this matter.

[10] In my 15 years' service as a justice, my experience in the adoption of proposals and other administrative matters, and the entry of orders, is as follows:

It is rare when this Supreme Court adopts proposals or other administrative matters with "immediate effect."

Such matters usually are adopted without an effective time as it is the general rule that the adopted item is effective at the time the Clerk of the Court enters the order within a reasonable time—usually a few days or a week—as the Court "speaks through its orders."

For an administrative matter, not a case matter, if any justice indicates he or she will write a statement, he or she has 14 days to submit it and other justices wishing to respond to it have 14 days to respond—a maximum of 28 days delay from adoption to entry.

Exceptions to the general rule above are:

Sometimes a matter is adopted with a specific future time to be effective like 30 days, 6 months, or 1 year later and the order is entered (after statements within 28 days) before the effective date, but is only effective on the specific adopted date, not the date of the entry of the order.

Other times, those of emergency, which rarely occur, the adopted matter is voted "immediate effect" and should be entered and therefore effective on that day of adoption. For example, see Administrative Order 2006-08, "the Gag order," which stated:

> The following administrative order, supplemental to the provisions of Administrative Order No. 1997-10, is effective immediately.

> All correspondence, memoranda and discussions regarding cases or controversies are confidential. This obligation to honor confidentiality does not expire when a case is decided. The only exception to this obligation is that a Justice may disclose any unethical, improper or criminal conduct to the JTC or proper authority.

> Cavanagh, Weaver and Kelly, JJ., dissent.

> Dissenting statements by Weaver and Kelly, JJ., to follow.

If delay occurs for entering the day of adoption, the order is entered as soon as possible *"nunc pro tunc"* (Latin for "now for then") making the late-entered order effective retroactive to the date of adoption. In either case, concurring, dissenting and responding statements by justices are not included with the order and the order has a notation that statements will follow.

Unfortunately these rules were not followed in this administrative item and it would not matter but for these two consequences:

1. Justices Young and Corrigan's attempts to avoid being governed by the new rule adopted in their presence November 5, by filing their statements refusing to be disqualified right before the close of business on November 18, apparently trying to beat the clock, believing the disqualification order would enter November 19 at an emergency (but not identified as such) private administrative conference.

After the Court provided for "immediate effect" of the amendment to MCR 2.003, this Court *should* have issued the order containing the amendment with a notation that any statements by justices, whether concurrences or dissents, would be released together at a future time. Instead, in a private administrative conference on November 19, 2009,[11] a majority of this Court established that all statements from justices had to be circulated to the Court by November 25, 2009 and that the order adopting the amendment to MCR 2.003 would also issue at that time, November 25, 2009.[12]

The delay and seeming confusion that has arisen from the entry of this order is unfortunate because it deprived the parties and the public for 20 days of their right to have access to the language of the amendment to MCR 2.003, which was given "immediate effect." Further, it allowed two justices to attempt to avoid the application of a new written rule for a justice's disqualification to pending motions for their disqualification in a case.

Specifically, on November 18, 2009, Justices Corrigan and Young directed the Clerk of the Court to submit their responses to the pending motions for recusal against them in the case of *Pellegrino v Ampco Systems Parking*, Docket No. 137111. In his response to the recusal motion, Justice Young stated that "I am deciding this motion under this Court's current and traditional rules for disqualification because they are still in effect . . . ." Thereafter, Justice Corrigan indicated in her responding statement that "[l]ike Justice Young, I am deciding this motion under this Court's current and traditional rules of disqualification . . . ."[13] Despite the fact that Justices Corrigan and Young attempted to avoid complying with the new amended court rule, it remains to be seen whether their denials to the motions for their recusal will be subject to the procedures and safeguards in the newly amended MCR 2.003—Disqualification of Judge.

2. Leaving "immediate effect" with an Alice in Wonderland definition where "immediate effect" does not mean "immediate effect" and the public is deprived of knowledge of what exactly was adopted with no copies available for now 20 days.

[11] This private administrative conference was justified as not being held in a noticed public administrative conference because it was rightfully an emergency, although it has not yet been so identified.

[12] A motion was made by Justice Weaver to issue the order that day, November 19, with a statement indicating that the order was *nunc pro tunc* to November 5, meaning that it would be retroactive to November 5, 2009 when the Court actually voted to give the amendment to MCR 2.003 "immediate effect." There was no second to this motion.

[13] Justice Markman recognized that the rules were adopted with "immediate effect" on November 5, 2009 when he stated in a e-mail dated November 18, 2009: "This Court made clear at conference that it intended the new disqualification rules to be 'effective immediately.'"

Again, the adoption of the amendment to MCR 2.003—Disqualification of Judge—is a positive, historical step forward toward achieving more transparency and fairness in the Michigan Supreme Court. The amended rule provides a fair disqualification process to ensure that the parties appearing before the Court have justices deciding their cases that are not actually biased, nor objectively appear to be biased. It does so in a transparent process by requiring a justice challenged by a party to submit his or her decision and reasons in writing regarding recusal decisions and requiring the Court—the remaining justices—as requested by a party to review the challenged justice's decision and to publish the remaining justices' decision and reasons in writing. This process, of written decision and with written reasons, is fair to the parties and to the challenged justice. It provides the public with more knowledge of how the justices conduct the people's judicial business.

Hopefully, the day will come when every justice will give these new, written and fair rules for disqualification of justices an opportunity to work and, if experience proves necessary, to refine such rules by workable proposed amendment. And hopefully the day will come when some justices no longer resort to proclaiming dramatic forecasts of failure, negative consequences, or unconstitutionality, and no longer attempt to avoid application of the disqualification rules to themselves as we have seen so far.

Unnecessary delay and attempts to avoid application of adopted rules do not contribute to public confidence in the way some justices perform their duties and in the way the Michigan Supreme Court conducts its business.[14]

CORRIGAN, J. (*dissenting*).

"*May God save these United States, the State of Michigan, and this Honorable Court.*" -- Michigan Supreme Court traditional *oyez*

It is always wise to be wary of any government action taken the day before a holiday or late on a Friday. Such actions are designed to travel under the radar screen. So it is with this 4-3 order.

Tomorrow we celebrate Thanksgiving. Many Americans will pause to thank our Creator for the blessings of liberty—for the right to speak free from government oppression and for the right to vote in free elections and have those votes count.

How sadly ironic, then, that this order empowers the Court to curtail those fundamental freedoms—the rights of judicial candidates to speak their minds under clear standards and the rights of voters to elect judges of their choosing. For the first time in our state's history, duly elected justices may be deprived by their co-equal peers of their constitutionally protected interest in hearing cases. Starting today, those contesting traffic tickets will enjoy greater constitutional protections than justices of this Court.

---

[14] This statement and the order amending MCR 2.003—Disqualification of Judge—will be published on my personally funded website: **justiceweaver.com.**

The justices in the majority, having assumed the power to remove a co-equal justice, have not lifted a pen to establish their authority to do so. Their new regime brings to mind George Orwell's *Animal Farm*: "All animals are equal[,] but some animals are more equal than others."[15] Of all the justices who have served during this Court's 173-year existence, only the four justices adopting these rules arrogate to themselves this new, "more equal" dominion over their colleagues.

This Court's order also imperils civility among the justices. The current philosophical and personal divisions on this Court are no more than a mild case of acne compared to the cancerous vitriol sure to spew from justices' pens. "Every kingdom divided against itself is laid waste, and no city or house divided against itself will stand." Matthew 12:25 (New Revised Standard). Today's order will guarantee a permanent siege within this institution.

No issue that I have ever tackled is as important as these disqualification provisions. The majority's action here will precipitate a constitutional crisis.

Many have applauded this Court's disqualification initiative. They have not done their homework! The devil is always in the details, and the details of this order eviscerate fundamental freedoms.

I support clear rules that would establish written constitutional standards for the disqualification of judges and justices. But I oppose the ill thought out provision of MCR 2.003(D)(3)(b) that allows justices to review de novo another justice's decision not to disqualify from a proceeding.

Chief Justice THOMAS GILES KAVANAGH once said that the members of this Court are seven people on a boat in stormy seas. This provision allows those seven people to throw one another overboard. Peer review of recusal decisions will lead to rancor and incivility in this most fragile and battered institution.[16] This rule is a lacerating wound to this institution. Those who are privileged to be at the Supreme Court table are short timers, just temporary occupants of these chairs. This order will do lasting harm to this institution—and the case for change has not been made.

## Violation of the United States and Michigan Constitutions[17]:

---

[15] Orwell, *Animal Farm* (New York: Signet Classics, 1996), p 133.

[16] The State Bar of Michigan Board of Commissioners narrowly voted in favor of permitting peer review of a justice's recusal decision despite recognizing the potential for litigants' gamesmanship in the review process. The Board also suggested creating an independent review panel but acknowledged that a constitutional amendment may be required to create the panel. Several commissioners told me that the issue was hotly debated and that the independent review panel was proposed because they did not believe that members of the Court should review de novo a justice's declination to recuse.

[17] Contrary to Chief Justice Kelly's suggestion that our constitutional arguments were not raised before the rule was passed, the arguments were raised at administrative hearings, as Justice Young has explained. Further, the text of the recusal rule as enacted by the

## Michigan Constitution

The basic question is whether the Michigan Constitution authorizes today's move. It does not.

Our constitution created a Supreme Court composed of seven elected or appointed justices. Const 1963, art 6, §§ 2 and 23. Under our constitution, a sitting justice may be removed from the bench only in certain ways. First, a justice may be removed under the impeachment provisions in Const 1963, art 11, § 7. Next, a justice may be removed for reasonable cause by a concurrent resolution of two-thirds of the members elected to and serving in each house of the Legislature. Const 1963, art 6, § 25. And finally, this Court may remove a justice upon recommendation of the Judicial Tenure Commission. Const 1963, art 6, § 30(2). The constitution provides no other authority for justices to remove one another. The majority's new rule falls within none of the express methods of removal set forth in our constitution.

So if it is not to be found in the constitution, then where do my colleagues in the majority derive their newly discovered power to remove a fellow justice? They offer not the slightest justification. If the majority believes that such authority somehow inheres in the judicial power of this Court, they are fundamentally mistaken. The judicial power is the "authority to hear and decide controversies, and to make binding orders and judgments respecting them." *Risser v Hoyt*, 53 Mich 185, 193 (1884). Our state constitution vests the "judicial power" in one court of justice, headed by this Court, which consists of seven justices of equal power and authority. Const 1963, art 6, §§ 1 and 2. Although we "hear and decide controversies" and "make binding orders and judgments respecting them" by majority vote, no individual justice has more authority to exercise the judicial power than another justice, and nothing in the nature of the judicial power gives this Court or any justice the power to remove a duly elected or appointed justice. See, e.g., *People v Paille #1*, 383 Mich 605, 607 (1970) ("Whatever intra-court battles occasioned the adoption of the restriction upon intra-court review, *the wisdom of preventing judges of equal station from overruling each other abides.*") (emphasis added); *Dodge v Northrop*, 85 Mich 243, 245 (1891) ("Courts of concurrent jurisdiction cannot set aside or modify the orders and decrees of other courts of like jurisdiction."); *In re Wayne Co Prosecutor*, 110 Mich App 739, 742 (1981) (noting the holding in *Paille* that "the dual function of Detroit Recorder's Court as a magisterial court as well as a felony trial court *does not provide for intra-court review whereby judges of equal station might overrule one another.*") (emphasis added); *Wayne Co Prosecutor v Recorder's Court Judges*, 81 Mich App 317, 322 (1978) ("Judges of co-equal authority lack jurisdiction to set aside the orders of bond forfeiture issued by their fellow judges."). Indeed, that may be precisely why in the United States Supreme Court each justice

---

majority was not circulated to the Court until one day before the November 5, 2009, administrative conference.

decides the recusal question individually; the other justices possess no authority to remove a justice.[18]

To make matters worse, it appears the majority's violations of our state constitution may have only just begun. At the November 5, 2009, public hearing, the Chief Justice suggested that the majority may promulgate a rule for appointing a replacement justice when a duly elected or appointed justice is recused. She opined:

> Clearly this rule isn't perfect, and I view it as the first step in the realization of a truly excellent rule. Missing from this is any discussion of replacing a disqualified justice with another judge for the purpose of hearing the case involved. I think that's essential. It isn't here. I'd like to see that subject addressed another day.

Const 1963, art 6, § 2, however, provides that the "supreme court shall consist of seven justices ...." Because a recused justice simply does not participate in the case and does *not* cease to be a justice of the Court, the Chief Justice's suggestion would at the very minimum add an eighth justice. As Justice YOUNG explains more fully, referencing my statement at 483 Mich 1205, 1229-1234 (2009), our constitution does not authorize the appointment of temporary justices in excess of the seven justices that have been duly elected or appointed. The majority's potential arrogation of power to itself apparently knows no bounds.

### United States Constitution

The new rule also fails to ensure that minimal due process protections will be accorded to the challenged justice in a recusal appeal. Because justices elected to this Court have a vested property right in exercising their judicial duties, they cannot be divested of that right without an opportunity to be heard before an impartial arbiter. See *Goldberg v Kelly*, 397 US 254, 271 (1970); *Ng Fung Ho v White*, 259 US 276, 284-285 (1922). The majority has not adopted Justice YOUNG's proposed amendments that would have provided the challenged justice the right to counsel, the right to file a brief, and the right to an evidentiary hearing to determine any material factual questions. Also, as Justice YOUNG's cogent dissenting statement, which I join in its entirety, explains well, the majority's new rule violates the First Amendment right to freedom of speech because it trenches on judicial campaign speech protected by *Republican Party of Minnesota v White*, 536 US 765 (2002). The majority's refusal to accord even basic constitutional rights thus calls the validity of the entire new scheme into question.

This rejection of clearly defined procedural protections will likely encourage baseless recusal motions by those seeking to "justice-shop."[19] Indeed, some members of

---

[18] See also Letter: New court rules may let minority win, The Detroit News, letter to the editor from Timothy Baughman, November 18, 2009, attached as Appendix A.

[19] See Bashman, *Recusal on appeal: An appellate advocate's perspective*, 7 J App Prac & Process 59, 71 (2005) (stating that while the "subject of strategic recusal . . . is not often discussed, no doubt because the goal seems to be unfair and unethical . . . you can be sure that strategic recusals do occur.").

the current majority seem willing to entertain ploys to remake the elected composition of this Court to fit the ideological or partisan preferences of certain parties or lawyers.[20] Both this Court and, more importantly, the people of Michigan whom we were elected to serve, deserve better.

By far the most troubling implication of today's new rule is the majority's outright deprivation of the retained sovereign right of the people of Michigan to elect the members of their judicial branch of government. The constitutional magnitude of this action should not be underestimated. With one fell swoop, the majority simply casts aside the one-man, one-vote principle of *Baker v Carr*, 369 US 186 (1962). The justices of this Court were elected by our fellow citizens to hear and decide cases. We campaigned on our judicial philosophies, explaining our philosophies in deciding cases that come before us. The people then chose the justices that they preferred to sit on this Court in free elections where each vote counted equally. In one administrative order, the majority takes away the right of every citizen of Michigan to have his or her vote count. Instead of "one-man, one-vote," we now have "four-justices, one-vote," as four justices usurp the people's constitutional right to choose who decides the cases coming before the highest Court in our state.

### *Caperton v A.T. Massey Coal Co, Inc:*

I have also studied carefully the United States Supreme Court's recent decision in *Caperton v A.T. Massey Coal Co, Inc.*[21] The question under *Caperton* is whether the Due Process Clause of the federal constitution requires this change—that is, that this Court review de novo a justice's decision not to disqualify himself from a proceeding. My research reflects that not one state that has examined its rules post-*Caperton* has changed its rules regarding the identity of the decision maker.[22] Indeed, Michigan becomes an outlier by doing so. The federal constitution plainly does not require any such action.

The United States Supreme Court itself has not changed its own recusal practices in response to *Caperton*. That is, it continues to leave recusal decisions to each individual justice. Nothing in *Caperton* remotely suggests that this longstanding practice violates due process. *Caperton* considered the standards for recusal, not the identity of the decision maker. And unlike the United States Supreme Court, where individual

---

[20] See, e.g., *Commentary: Beware power grab for Michigan court*, The Detroit News, November 19, 2009, attached as Appendix B.

[21] *Caperton v A.T. Massey Coal Co, Inc*, ___ US ___; 129 S Ct 2252; 173 L Ed 2d 1208 (2009). *Caperton* held that a state supreme court justice was required to recuse himself from a case involving a corporate party whose chairman and CEO supported the justice's campaign both by directly donating the statutory maximum to the justice and by contributing $2.5 million to an independent group that targeted the justice's opponent during the electoral process because the sum of these contributions raised "a serious, objective risk of actual bias" on the part of the justice. *Id.* at ___, slip op at 16.

[22] My memo to the Court on this subject is attached as Appendix C.

justices' recusal decisions are entirely unreviewable, recusal decisions of justices of this Court *are* subject to review in the United States Supreme Court.

## National Implications:

*"The game is out there and it's either play or get played . . . [It's] all in the game."*
                                        *- The Wire*[23]

Myriad questions of national importance bob in the wake of this new disqualification procedure. Do judicial candidates or incumbent justices seeking reelection show "an appearance of bias or prejudice" even if they merely respond to an organization's questionnaire about their personal views on legal and social issues?[24] Across the country, organizations have challenged, with varying degrees of success, the constitutionality of certain provisions in state codes of judicial conduct insofar as those provisions infringe on the campaign speech of judicial candidates.[25] Plainly, a line exists between what a judicial candidate can and cannot say during the electoral process.[26] Nevertheless, the amorphous standards in the new rule do not clarify the appropriate demarcation between constitutionally protected campaign speech and disqualifying conduct.

Moreover, the national debate regarding the necessity of new federal recusal procedures is ongoing.[27] Regrettably, however, most of the discussion is glaringly one-sided. I see little interest in truly considering opposing viewpoints. The House Judiciary Subcommittee on Courts and Competition Policy, chaired by Georgia Congressman Hank Johnson, recently postponed a hearing regarding judicial recusals scheduled for October 20, 2009. The chairman of the Judiciary Committee, Michigan Congressman John Conyers, has apparently rescheduled the hearing for December 10, 2009. Three of my colleagues who voted for the new recusal rules have apparently been invited to testify in person at the upcoming Judiciary Committee hearing. In contrast, no member of the

---

[23] The Wire, 100 Greatest Quotes, <http://www.youtube.cpm/watch?v=-Sgj78QG9B> at 3:36 and 9:50 to 9:55 (accessed November 25, 2009).

[24] See, e.g., *Duwe v Alexander*, 490 F Supp 2d 968 (WD Wis, 2007).

[25] Compare *Kansas Judicial Review v Stout*, 562 F3d 1240 (CA 10, 2009) (dismissing lawsuit filed by political action committee, judicial candidate, and prospective candidate as moot because the Kansas Supreme Court adopted a new Code of Judicial Conduct after answering questions certified about former Code provisions) with *Duwe, supra* at 977 (holding that judicial candidates' responses to survey questions are constitutionally protected speech and do not constitute commitments that could be restricted in the interest of protecting judicial openmindedness).

[26] See *Republican Party of Minnesota, supra.*

[27] David Ingram, The National Law Journal, *Congress Set to Take Aim at Judicial Recusals,* <http://www.law.com/jsp/article.jsp?id=1202435099939> (accessed November 23, 2009).

Court who voted against these rules has been invited to testify. My offer to testify in person was rejected by a staffer for the House Judiciary Subcommittee on Courts and Competition Policy. I was told that I could submit a five-page written statement. So much for full and robust debate about the appropriate scope and structure of any potential recusal guidelines.

Moreover, there appears to be a national push among a handful of well-funded interconnected advocacy groups to disqualify judges who express their views during the electoral process. I am aware that George Soros does not support judicial elections. Certain Soros-sponsored groups, including the Brennan Center for Justice and Justice at Stake, have enthusiastically lauded the efforts of the majority.[28] Many voters would be surprised to know about the extensive financial ties that exist between these organizations and George Soros's main foundation, the Open Society Institute. Preliminary scrutiny of IRS Form 990s reveals that the Open Society Institute has spent at least $34 million to derail judicial elections in favor of merit selection since 2000.[29]

Consistent with these national efforts, when Chief Justice KELLY told the public that the Court has only begun its efforts at divining detailed disqualification rules at our November 5, 2009 public administrative conference, she added:

> Also not present in this rule is the question of when financial contributions to sitting justices constitute the appearance of bias or the probability of bias such as to require disqualification. That's I think an important matter that has to be addressed and I hope that we will address it soon in the future.[30]

---

[28] See Jonathan Blitzer, *Recusal Reform in Michigan*, July 31, 2009 ("With Justice Elizabeth Weaver leading the charge, the Michigan Supreme Court is poised to codify new standards for how and when judges must recuse themselves.") <http://www.brennancenter.org/blog/archives/recusal_reform_in_michigan/> (accessed November 23, 2009); see also Gavel Grab Blog, *Brandenburg on the Future of Recusal*, November 19, 2009 (where the executive director of Justice at Stake describes the new "tougher" recusal rules as a sign that Michigan is moving "forward instead of backward.") <http://www.gavelgrab.org/?cat=42> (accessed November 23, 2009).

[29] See <http://www.eri-nonprofit salaries.com/index.cfm?FuseAction=NPO.Form990&EIN=137029285&Year=2009> (accessed November 23, 2009). Additionally, since December 4, 2008, regional advocacy groups, including the Joyce Foundation, have donated $400,000 to the Brennan Center and $190,000 to Justice at Stake. See *Money and Politics Grants List* <http://www.joycefdn.org/programs/moneypolitics/grantlist.aspx> (accessed November 23, 2009).

[30] See minutes 1:02:25 to 1:03:35 of the November 5, 2009 public administrative conference at <http://www.michbar.org/courts/virtualcourt.cfm> (accessed November 23, 2009).

Any effort to expand our new disqualification procedure is ill-advised. The Wisconsin Supreme Court, for example, recently rejected two proposals submitted by the League of Women Voters of Wisconsin Educational Fund and former Justice William Bablitch respectively. The League of Women Voters' proposal would have required justices to disqualify themselves if a lawyer, law firm, or party to a case donated more than $1,000 or if a party contributed to "a mass communication that was disseminated in support of the judge's election" within the preceding two years. In contrast, Justice Bablitch's proposal would have mandated recusal if a lawyer or party donated $10,000, the legal limit for individual contributions to a judicial candidate's campaign, and the proposal would require recusal for certain third party expenditures.[31] After a lengthy public hearing, the Wisconsin Supreme Court instead adopted a proposal clarifying that endorsements, campaign contributions, and independent ad expenditures, standing alone, are not enough to require a justice to recuse himself or herself.[32] In other states, including Florida, committees continue to evaluate appropriate recusal procedures after soliciting input from judges, attorneys, and legal scholars.[33] In light of the uncertainty in various states concerning judicial disqualification procedures, the hasty adoption of these rules today is imprudent and unwise.

Finally, the majority's action is a self-inflicted wound. This rule will take the honor from "your Honor." What foolish person would run for this Court and allow his or her hard earned reputation to be sacrificed not by the slings and arrows of a vitriolic election campaign, but at the hands of colleagues? So much for civility initiatives.

---

[31] Adam Korbitz and Alex De Grand, State Bar of Wisconsin, *Court to tackle recusal issue and other rules petitions*, October 27, 2009, <http://www.wisbar.org/AM/Template.cfm?Section=News&Template=/CM/ContentDisplay.cfm&ContentID=87014> (accessed November 24, 2009); Patrick Marley, The Milwaukee Journal Sentinel *State Justices Skeptical of Recusal Proposal*, October 28, 2009, <http://www.leagle.com/unsecure/news.do?feed=yellowbrix&storyid=137049882> (accessed November 23, 2009).

[32] Patrick Marley, *State High Court Says Campaign Donations Can't Force Recusals*, The Milwaukee Journal Sentinel October 29, 2009, <http://www.leagle.com/unsecure/news.do?feed=yellowbrix&storyid=137059379> (accessed November 23, 2009).

[33] Gary Blankenship, The Florida Bar News, *To Recuse or not to Recuse: How to do it is the Real Question*, November 1, 2009, <http://www.floridabar.org/DIVCOM/JN/JNNews01.nsf/8c9f13012b96736985256aa900624829/f51978310189653485257657006e60e4%21OpenDocument> (accessed November 23, 2009).

The people of Michigan cannot possibly benefit from this order. Today's order is a lacerating wound to this institution and the people of Michigan.[34] May God save these United States, the state of Michigan, and this honorable Court.

YOUNG, J., concurs with CORRIGAN, J.

YOUNG, J. (*dissenting*). I respectfully dissent from the new majority's enactment of this unconstitutional rule of disqualification. *In eliminating all due process protections, compromising and chilling protected First Amendment rights, and conducting secret appeals that might lead to the removal of an elected justice from a case against his will, the majority has created a 21st Century Star Chamber with its new disqualification rule.*

The issue here is not *whether* this Court should have a disqualification rule—we have had a disqualification rule for 173 years that mirrored the rule that the United States Supreme Court continues to use—but rather *which* disqualification rule best ensures that parties whose cases are decided by this Court have neutral arbiters deciding those cases. Every member of this Court purports to subscribe to the elementary principle of due process that parties whose cases are decided by this Court must have impartial justices deciding those cases.[35] *However, the plain fact is that the rule issued today is facially unconstitutional in several critical ways, with the result that it will allow four justices to disenfranchise the millions of Michigan voters who elected a justice. And it is also the fact that the justices who voted for this rule—KELLY, CAVANAGH, WEAVER and HATHAWAY—enacted this new rule despite having knowledge that the rule was constitutionally deficient.*[36] The citizens of Michigan should be concerned when a

---

[34] In the event the majority precipitates a constitutional crisis by purporting to oust a justice from a case, I leave all my possible options open.

[35] "A hearing before an unbiased and impartial decisionmaker is a basic requirement of due process." *Crampton v Dep't of State*, 395 Mich 347, 351 (1975).

[36] There are two responses to Chief Justice KELLY's claim that these constitutional concerns were raised only at the "eleventh hour." First, as Justice CORRIGAN states, the rule that the Court voted on was circulated to the Court just the day before conference. Second, Chief Justice KELLY's suggestion that the Court has no obligation to consider these constitutional objections, even if raised at the hearing, is an abrogation of the obligation that each justice makes to uphold the federal and state constitutions. Moreover, Justice Markman also proposed several amendments at the November 5, 2009 administrative hearing to address some of the constitutional deficiencies with the rule, which he circulated to members of the Court well in advance of the administrative hearing. I also circulated to all members of the Court on November 19, 2009 written proposals to address the constitutional problems I raised. This memorandum is attached as Appendix A. The public is invited to access our administrative hearing at <http://www.michbar.org/courts/virtualcourt.cfm> (accessed November 24, 2009), to

majority of their Supreme Court is indifferent to the state and federal constitutions they have been entrusted and have sworn to uphold.

## The New Rule Violates the Fourteenth Amendment Right to Due Process

The removal of a sitting justice against his or her will is a serious matter trenching upon the right to execute the duties of the office to which the justice was elected, as well as an infringement on the rights of electors who placed the justice in office. A justice subject to a motion for disqualification is entitled to the basic due process rights of notice and opportunity to be heard.[37] Heretofore, only an appeal to the United States Supreme Court could reverse a Michigan justice's determination regarding a motion to disqualify. In an appeal taken from a Michigan justice's denial of a motion for disqualification, the challenged justice is entitled to the full range of due process rights that all appellees before the United States Supreme Court are entitled. A justice challenged on such an appeal from his decision not to recuse therefore has a right to counsel, to file briefs in opposition to the appeal, to have the issues on which the disqualification is predicated framed in advance, and the right to have it decided by a neutral arbiter. *The new rule eliminates all of these due process rights.*

The new rule creates an appellate process whereby the members of the Michigan Supreme Court, rather than the United States Supreme Court, will determine whether one of their challenged colleagues may sit on a case. By interposing itself as an appellate body in the disqualification decision, this Court must afford the targeted justice no fewer rights than he enjoyed in such an appeal to the United States Supreme Court. As stated, a justice has the right to have an appeal be limited to the grounds stated in the motion for disqualification, to retain counsel in the matter, and to submit a brief in response to the motion for disqualification. Sometimes, due process will also necessitate an evidentiary hearing, as there may be facts in dispute between the moving party and the challenged justice. *Notwithstanding these constitutional requirements of due process, the new majority protected none of them, even though I specifically raised each of them to the Court before this order entered and provided proposed language to the rule that would remedy these constitutional deficiencies.*

---

determine whether Chief Justice KELLY or I have accurately described the discussion of constitutional questions I raise herein.

**As important, the Chief Justice has refused to place on our next administrative agenda my written proposals so that they can be considered by the Court.** This course of conduct underscores my contention that the new majority is indifferent to the serious constitutional questions I and my colleagues in dissent have placed before them.

[37] "'The fundamental requisite of due process of law is the opportunity to be heard.'" *Dow v State of Michigan*, 396 Mich 192, 205 (1976), quoting *Grannis v Ordean*, 234 US 385, 394 (1914). "The 'opportunity to be heard' includes the right to notice of that opportunity." *Id.*

Moreover, if due process means anything—particularly in the disqualification setting where this issue is pivotal—a targeted justice is most assuredly entitled to have an *impartial* arbiter decide the question. When the United States Supreme Court is the arbiter, no serious question on this point arises. *However, when the justices of this Court become the arbiters of a disqualification decision of one of its members, there are substantial questions whether an impartial arbiter is involved.* It is no secret that this Court is riven with deep philosophical, personal, and sometimes frankly partisan cleavages.[38] Where personal and political biases could affect the decision-making of members of this Court in the new disqualification appeal process, I cannot imagine that due process demands anything less than the right to challenge the potential biases of the decision-makers in this appellate procedure. Yet the new rule provides no mechanism for challenging the bias of a member of this Court in the appeal process it establishes today. At the November 5, 2009 administrative conference, the new majority specifically repudiated Justice MARKMAN's proposed amendment addressing this issue. The new majority also refused to consider all of the specific due process rules I later proposed in writing. *The majority's open rejection of these basic constitutional protections indicates that it is willing to sacrifice essential requirements of due process in enacting this rule. The open question is why.*

---

[38] Justice WEAVER has already gone on record stating that I ought "to recuse [myself in a case] in which Mr. Fieger is himself a party" because of campaign remarks I made in 2000. *Grievance Administrator v Fieger,* 476 Mich 231, 328 and 340 (2006) ( WEAVER, J. dissenting). See also *State Automobile Mut Ins Co v Fieger,* 477 Mich 1068, 1070 (2007). She has also gone on the record as dissenting from my participation in cases "where Mr. Geoffrey N. Fieger's law firm represents" a party. *Ansari v Gold,* 477 Mich 1076, 1077 (2007). See also *Flemister v Traveling Med Services,* 729 NW2d 222 (2007); *Short v Antonini,* 729 NW2d 218 (2007); *Johnson v Henry Ford Hosp,* 477 Mich 1098, 1099 (2007); and *Tate v City of Dearborn,* 477 Mich 1101, 1102 (2007). As I note below, Mr. Fieger and his firm have been responsible for nearly all the disqualification motions filed during my tenure on the Court. All have been based on campaign speech and all have been unsuccessful here and in the federal courts, including the United States Supreme Court, where he appealed my denials.

Other of my colleagues have made explicitly hostile partisan comments. See, for example, our Chief Justice's recent comment wherein she promised to "undo a great deal of the damage that the *Republican* Court has done." Brian Dickerson, *Justices Gird for Gang of 3½,* Detroit Free Press, January 11, 2009, at 1B (emphasis added). Some sitting members of this Court openly campaigned against Chief Justice TAYLOR's re-election last year. These actions and published statements fairly call into question how impartially some of my colleagues will decide disqualification appeals under the new rule they have established.

## The New Rule also Violates the First Amendment Right to Freedom of Speech

Even beyond the specific due process requirements that the new majority has thrown overboard, the new rule facially violates a judge's First Amendment rights. In every written constitution since 1850, the People of Michigan have retained their sovereign right to elect judges rather than surrender that right to some other process. Accordingly, judicial candidates in Michigan campaign for judicial office. In campaigning, they will engage in political speech that is clearly protected under the First Amendment.[39] The protection of speech guaranteed under the First Amendment is especially important within the context of political campaigns. James Madison, drafter of the First Amendment, wrote:

> The value and efficacy of [the right of elections] depends on the knowledge of the comparative merits and demerits of the candidates for public trust, and on the equal freedom, consequently, of examining and discussing these merits and demerits of the candidates respectively.[40]

Thus, any restrictions on campaign speech not only infringe on a candidate's right to speak, but also infringe on the *public's* right to vote intelligently on their candidates.

The importance of citizens' decisions regarding whom to entrust with public office deserves no less than a robust public discussion of issues by candidates seeking their votes. *The order issued today, however, frustrates this kind of political discussion between judicial candidates and voters and penalizes a judicial candidate for trying to do so.* The order expressly contemplates that campaign speech protected under the First Amendment will nevertheless cause a duly-elected judge to be disqualified from hearing a case. This is so because the new rule establishes that campaign political speech is subject to an "appearance of impropriety" limitation. Apart from the fact that it is

---

[39] *Republican Party of Minnesota v White*, 536 US 765 (2002).

[40] James Madison, *Report on the Virginia Resolutions*, available at <http://press-pubs.uchicago.edu/founders/documents/amendI_speechs24.html> (accessed November 19, 2009).

inherently a nebulous standard,[41] the "appearance of impropriety" standard is not a constitutional standard.[42]

*Thus, even if the challenged political speech in no way implicated actual bias against a party (or any other constitutional right of such a party), an elected justice is still liable to be disqualified if his campaign comments were later determined to create an appearance of impropriety.* It is not hard to contemplate campaign speech that might offend and later be considered "improper" under the new rule's standard.[43]

Moreover, the mere *threat* of future disqualification produces a chilling effect on protected speech. The United States Supreme Court's decision in *Republican Party of Minnesota v White* struck down the Minnesota Supreme Court's rule forbidding an incumbent judge or candidate for judicial office from "announc[ing] his or her views on disputed legal or political issues" during an election campaign.[44] While the Minnesota

---

[41] We cannot even be sure that the justices who voted for the rule understand its own implications. See, e.g., note 23, *infra*.

[42] Even the rule's proponent, Justice HATHAWAY, recognizes that "appearance of impropriety" is an extraconstitutional standard. At our November 5, 2009 administrative conference, Justice HATHAWAY explained, "*Caperton* says that states can have stricter standards [than due process requires]. . . . We have Canon 2 of the Michigan Code of Judicial Conduct, which talks about a judge having to adhere to the appearance of impropriety standard." Justice HATHAWAY *clearly believes that the appearance of impropriety does and should trump First Amendment rights.* So, apparently, do her colleagues in the majority.

[43] I made this very point in my statement concerning a disqualification motion addressed to Justice HATHAWAY. See *United States Fidelity & Guaranty Co v Michigan Catastrophic Claims Ass'n (On Rehearing)*, 484 Mich 1, 60 (2009) (statement of YOUNG, J.). In fact, journalists looking at Justice HATHAWAY's campaign statements questioned whether she could be fair and impartial to all parties. An article written on the occasion of Justice HATHAWAY's investiture suggested that "[i]n her campaign . . . Hathaway seemed to take sides. She suggested that, if elected, she would be the 'voice' of and stand up for 'middle-class families,' instead of 'siding with big insurance companies and polluters' and 'big corporations.'" Todd Berg, *Diane M. Hathaway Sworn in as Michigan Supreme Court's 104th Justice*, Michigan Lawyers Weekly, January 12, 2009. It will be interesting to see how Justice HATHAWAY fares under the new recusal standard she has championed if challenged by the very parties she stated she would "side against" if elected.

[44] *Republican Party of Minnesota v White, supra*, 536 US at 768.

Supreme Court's restriction on campaign speech was more expressly content-based than the rules promulgated by this order, *the new majority here is attempting to achieve indirectly what the United States Supreme Court declared in* White *that a court could not do directly: stifle protected judicial campaign speech.* The new "appearance of impropriety" standard is so broad and vague that judges and judicial candidates will be forced to self-limit their campaign speech so that, once they are elected, they can actually exercise the duties of the office they have sought. Thus, this rule is facially unconstitutional because it expressly allows a jurist's First Amendment right to free speech to be subordinated to a nonconstitutional standard. *The new majority is untroubled by this obvious abridgement of First Amendment rights that their new rule causes. Again, the question remains how the new majority could be so unconcerned about such a serious matter.*

### The Michigan Constitution Does Not Allow this Court to Remove a Justice from an Individual Case

Under the Michigan Constitution there are at most *four* ways a duly-sitting justice may be removed against his or her will:

- The People can choose not to reelect that justice.[45]

- The House can impeach a justice "for corrupt conduct or for crimes or misdemeanors" by majority vote. Upon impeachment, a judicial officer is forbidden from "exercis[ing] any of the functions of his office...until he is acquitted." The Senate can permanently remove a justice from office by a two-thirds vote.[46]

---

[45] Const 1963, art 6, § 2: "The supreme court shall consist of seven justices elected at non-partisan elections as provided by law. The term of office shall be eight years . . . ."

[46] Const 1963, art 11, § 7:

> The house of representatives shall have the sole power of impeaching civil officers for corrupt conduct in office or for crimes or misdemeanors, but a majority of the members elected thereto and serving therein shall be necessary to direct an impeachment. . . . No person shall be convicted without the concurrence of two-thirds of the senators elected and serving. Judgment in case of conviction shall not extend further than removal from

- The House and Senate can enact a concurrent resolution removing a justice "[f]or reasonable cause" that "is not sufficient ground for impeachment" by a vote of 2/3 of the members elected to each house, at which time the governor "shall" remove the justice.[47]

- This Court can remove a justice from the Court upon recommendation of the Judicial Tenure Commission.[48]

Notably, these constitutional provisions only refer to removal of a justice from *all* cases, not from a particular *individual* case, as this order allows. It is important to note, however, that there is no provision in the Michigan Constitution that explicitly allows this Court to overturn the elective will of the People and remove a justice from an individual case, nor is there any language that would even implicitly provide such authority.

Significantly, the Michigan Constitution has provided extra protections for judicial officers that no other officeholder enjoys. And it is not hard to imagine why the People would want to insulate judicial officers from political attacks that would impede their ability to discharge their duties of office. Accordingly, our Constitution acknowledges the primacy of judicial office—*even as between judicial office and executive or legislative offices*. It expressly precludes the recall of judges by Michigan voters while allowing the recall of all other elective officers.[49] In other words, the People have decided that, once they have elected a justice, that decision is final, at least for the duration of the justice's eight-year term. This extraordinary constitutional protection for judicial office is an important backdrop against which to assess the new majority's asserted right to prevent a sitting justice from exercising the duties of his office. If statewide judicial elections are to mean anything, it should not be up to four justices to

---

office . . . . No judicial officer shall exercise any of the functions of his office after an impeachment is directed until he is acquitted.

[47] Const 1963, art 6, § 25: "For reasonable cause, which is not sufficient ground for impeachment, the governor shall remove any judge on a concurrent resolution of two-thirds of the members elected to and serving in each house of the legislature. The cause for removal shall be stated at length in the resolution."

[48] Const 1963, art 6, § 30(2): "On recommendation of the judicial tenure commission, the supreme court may . . . retire or remove a judge . . . ."

[49] Const 1963, art 2, § 8.

pick and choose when to allow the will of the People to be heard and when to stifle that will. By creating through court rule the power to remove justices from individual cases, the majority has done just that.

The authority of this Court to remove an elected justice from a particular case is, therefore, highly questionable. In issuing its new recusal rules, the new majority has not adequately considered, much less justified, the authority of the Court to remove a justice in a particular case, especially since such removal by the fiat of four silences the People, who elected *seven* particular justices to the Court, who are not fungible. I am not sure by what logic an administrative rule may be used to amend our Constitution and create a new authority whereby an elected justice can be removed from a case by his co-equal justices. *While justices are constitutionally protected from political attacks from without, the new majority has conceived a clever means to launch political attacks from within the Court, giving a majority of four justices the ability to disenfranchise millions of Michigan voters by removing their elected justices from hearing cases that will affect their daily lives.*

## The New Rule Will Enhance Gamesmanship That Will Undermine the Integrity of Judicial Elections and This Court

*The new disqualification rule is simply bad policy that is the product of a manufactured crisis. Although it purports to ensure that only impartial justices sit on cases, the new rule has the effect of "weaponizing" disqualification as a tool to achieve countermajoritarian results to nullify elections. Shockingly, my colleagues have set themselves up as the gunners on the artillery they have manufactured.*

For the entire existence of our Court, the justices of the Michigan Supreme Court have conscientiously striven to address questions of judicial qualification,whether raised on motion by a party or by the justice. They have done so under our unvaried practice that mirrors the one used by the United States Supreme Court.[50] In short, a justice confronted with a disqualification motion has typically consulted with members of this Court and made a determination whether participation in a particular matter was appropriate. Other than providing their personal counsel, other members of the Court have not participated in the decision.

Until recently, no one has challenged, or apparently had reason to challenge, the Court's historical practice for addressing the issue of a justice's disqualification. Of late,

---

[50] See *Johnson v Henry Ford Hosp*, 477 Mich 1098, 1099 (2007). See also Statement of Recusal Policy, United States Supreme Court, November 1, 1993, available at 483 Mich 1237.

however, with the shift in the philosophical majority of this Court,[51] disqualification has taken on a new, more politicized role. One need look only as far as a recent volume of the *Michigan Bar Journal* for evidence of this new effort to politicize disqualification motions. In a letter to the editor, attorney John Braden suggests that the judicial electoral process is an unsatisfactory solution for addressing what he believed to be the unfavorable philosophy and decisions of the Court's former philosophical majority.[52] Therefore, he urged his colleagues in the Bar to use motions to disqualify as a suitable alternative to the electoral process guaranteed by the Michigan Constitution to alter the philosophical balance of the Court in order to achieve what he desired: more favorable results for his clients and himself. Moreover, it is entirely foreseeable that sophisticated and well-financed clients, like insurance companies and unions, will demand that their lawyers file motions for disqualification as a matter of course in order to alter the philosophical makeup of the Court in ways the electorate hardly intended. *Thus, today's order is no less than a call for the use of disqualification as a non-electoral political weapon to remove judges with whose judicial philosophy one disagrees. My colleagues, wittingly or not, in enacting this new rule, give aid to this politicized use of disqualification motions.*

Why do I claim that the new disqualification rule is a product of a "manufactured crisis"? The facts are very plain. After the Court's philosophical majority changed in 1999, disqualification motions became a tactic to alter the decision-making and outcome of a particular case. As I explained in my statement accompanying the proposed disqualification rules when originally published for public comment, each of the motions to disqualify made between 1999 and 2008 were brought against members of what was

---

[51] It is no secret that the philosophical majority of this Court changed with the 1998 Supreme Court election. The philosophical transformation of the Michigan Supreme Court that occurred eleven years ago, and the debate that has accompanied that transformation—a debate similar in some ways to that taking place within the federal judicial system—resonated strongly in the electoral political process, which the citizens of Michigan, through their constitution, have chosen as the method by which they select their justices. Perhaps not surprisingly, those who had been most comfortable with the approach of the Michigan Supreme Court over the previous decades were resistant to this transformation, and many responded forcefully in political opposition. The 2000 Supreme Court election, in which three members of the Court's prior philosophical majority stood for election, was one of the most bitterly contested in the state's history, as was the most recent Supreme Court election.

[52] See Opinion and Dissent, 85 *Mich B J* 10, 12 (2006).

then the Court's philosophical majority.[53] Importantly, nearly all of the motions to disqualify brought during my tenure on this Court were the product of one law firm.

Each of the motions to disqualify made by this firm involved various allegations of claimed bias, principally stemming from political speech in Michigan Supreme Court judicial campaigns.[54] This firm has taken advantage of the review process that our traditional disqualification practice guaranteed parties, by appealing my previous denials of its motions to disqualify to the United States Supreme Court at least three times. Notably, that Court has denied certiorari on each occasion.[55] Moreover, this firm has unsuccessfully challenged in federal court the constitutionality of this Court's historic practice of handling motions for judicial recusal that the Court today is jettisoning.[56] While the United States Supreme Court has denied these meritless claims of bias directed at me, as its decision in the *Caperton* case demonstrates, when warranted, the United

---

[53] Proposals Regarding Procedure for Disqualification of Supreme Court Justices, 483 Mich 1205, 1236 (2009). Since this statement, three additional motions for disqualification have been filed with the Court: an additional motion by the law firm described above to disqualify Justices MARKMAN and CORRIGAN and myself, and two separate motions to disqualify Justice HATHAWAY.

[54] In addition to a motion to disqualify me in the pending case of *Pellegrino v Ampco Systems Parking* (Docket No. 137111), by counsel's own admission, he has filed motions for my recusal in the following cases: *Tate v City of Dearborn*, 477 Mich 1101 (2007); *Johnson v Henry Ford Hosp*, 477 Mich 1098 (2007); *Flemister v Traveling Med Services*, 729 NW2d 222 (2007); *Short v Antonini*, 729 NW2d 218 (2007); *Ansari v Gold*, 477 Mich 1076 (2007); *State Automobile Mut Ins Co v Fieger*, 477 Mich 1068 (2007); *Grievance Administrator v Fieger*, 476 Mich 231 (2006); *Lewis v St John Hosp*, 474 Mich 1089 (2006); *Heikkila v North Star Trucking, Inc*, 474 Mich 1080 (2006); *Stamplis v St John Health Sys*, 474 Mich 1017 (2006); *McDowell v Detroit*, 474 Mich 999 (2006); *Harter v Grand Aerie Fraternal Order of Eagles*, 693 NW2d 381 (2005); *Gilbert v DaimlerChrysler Corp*, 469 Mich 883 (2003); *Graves v Warner Bros*, 469 Mich 853 (2003).

[55] *Graves, supra, cert den* 542 US 920 (2004); *Gilbert v DaimlerChrysler Corp, supra, cert den* 546 US 821 (2005); *Grievance Administrator v Fieger, supra, cert den* 127 S Ct 1257 (2007).

[56] See *Fieger v Ferry*, 2007 WL 2827801 (E D Mich, 2007).

States Supreme Court is not uninterested in reviewing and reversing a state justice's decisions on disqualification.[57]

Finally, it is not beyond imagining that the new disqualification procedure will become fuel for the ever-intensifying fire of judicial election campaigns in Michigan. For example, if Candidate A is running a campaign against Justice B, it is entirely possible that Candidate A would make a campaign issue over the number of times that Justice B's colleagues voted that he could not be an impartial arbiter of a case. *Although the new majority would no doubt deny it, the new rule it enacts today creates ample ammunition for future judicial electoral warfare.*

### The New Rule was Enacted with Unseemly Haste and in Violation of the New Majority's Commitment to "Transparency"

I close with a final point about the new majority's methods in enacting the rule contained in today's order. So eager was the new majority to enact this unconstitutional rule that they did so with unseemly haste.[58] They not only ignored the obvious

---

[57] See *Caperton v A T Massey Coal Co*, ___ US ___, 129 S Ct 2252, 173 L Ed 2d 1208 (2009).

[58] Furthermore, the arrogance that characterizes the majority's eagerness to enact new recusal rules *without even understanding their content* is utterly astounding. The following exchange occurred at our November 5, 2009, administrative conference, when I sought clarification regarding how the new "appearance of impropriety" standard would actually work:

> *Justice HATHAWAY.* If there is an appearance of impropriety, then you cannot sit on a case.
>
> *Justice YOUNG.* And from what perspective is the appearance of impropriety standard? Is it a subjective standard? Is it an objective standard?
>
> *Justice HATHAWAY.* I haven't thought through all that to be honest with you, to answer you here.
>
> *Justice YOUNG.* But we're going to vote on this today.
>
> *Justice HATHAWAY.* Then let's vote.

constitutional problems I and Justices CORRIGAN and MARKMAN had brought to their attention, they enacted the rule in violation of this Court's public administrative process. *The order issued today does not contain the rule this Court voted on in its November 5, 2009 public administrative conference.*

The disqualification rule approved at our November 5, 2009 administrative conference included my amendment to subsection (D)(1). When the motion to approve Justice HATHAWAY's proposed version of the rule was moved, it was explicitly subject to a friendly amendment I offered (which amendment Justice HATHAWAY accepted) regarding the language of subsection (D)(1). My amendment provided that the actual language of subsection (D)(1) of the rule would be determined *at a later date after conferring with Justice HATHAWAY.* In proof of this, I offer the following exchange that occurred at our November 5, 2009 public administrative conference when we voted on her proposal:

> *Chief Justice KELLY.* Can we act on the motion at this point? Shall we start, Justice Hathaway?
>
> *Justice HATHAWAY.* Well, first I'm going to include Justice Young's . . .
>
> *Justice WEAVER.* Well, no, you can just let him bring it up next time. Just keep it as it is.
>
> *Justice HATHAWAY.* I move that this Court adopt my November 4, 2009 version of alternative C as Michigan Court Rule 2.003 regarding disqualifications of judges.
>
> *Justice WEAVER.* Second.
>
> *Justice HATHAWAY.* And I support.
>
> *Justice YOUNG. **With a friendly amendment we can work out.***
>
> *Justice HATHAWAY. **Right. Regarding (D)(1).***
>
> *Chief Justice KELLY.* I think we've discussed this issue. Would you like to vote? [Roll call vote omitted.] It passes by a 4 to 3 vote. We have a new

---

As this exchange indicates, the members of the new majority are less interested in understanding how the rule actually works than in pushing through immediate adoption of these unconstitutional and ill-advised rules, whatever the cost, in order to supplant a practice that has served this state well for 173 years.

recusal rule. *We will take it up again at next month's meeting for further discussion at least of (D)(1).*[59]

Thus, this Court did not vote on a complete rule in our November 5, 2009 administrative conference.[60]

As this exchange shows, there remained a significant procedural issue to resolve before an order effectuating a new disqualification rule could enter and be given immediate effect: the actual language of subsection (D)(1) must still be settled.[61] Chief Justice KELLY acknowledged this and stated on the record that the rule would be returned to our December administrative conference to resolve the language of subsection (D)(1). *All of this was done in open Court, and members of the public are invited to verify whether I have accurately represented the proceedings and vote by accessing the video recording of the administrative conference from the State Bar of Michigan's "Virtual Court."*[62]

Therefore, I believe that issuing an order today before resolving the status of my amendment is improper and a contravention of the Court's commitment to conduct its administrative matters in public. *The issuance of the order today enacting this new disqualification rule that was not approved in open Court belies any pretense that this Court is functioning "transparently."*

Given the stated desire of this rule's proponents for having this Court's business done "in an open, transparent, restrained, orderly, fair, and efficient manner,"[63] there is

---

[59] Emphasis added.

[60] Once the language of the rule is finalized, however, it is to have immediate effect, as a subsequent majority vote determined.

[61] Justice WEAVER wanted an order that was *retroactive* to the November 5, 2009 vote on the new rule. No other justice supported her position. A court speaks through its orders. *Johnson v White*, 430 Mich 47, 53 (1988). The vote to establish a new disqualification rule cannot be given immediate effect without an order. The order being entered today is being given immediate effect, as desired by the majority. Whatever the timing of the order's effective date, *my point is that this order does not reflect the actual vote on November 5, 2009.*

[62] http://www.michbar.org/courts/virtualcourt.cfm (last accessed November 23, 2009).

[63] Justice WEAVER's dissenting statement to the minutes of November 13, 2008 conference, available at <http://www.justiceweaver.com/pdfs/eaw-dissent_satellite%20offices_12-2-08.pdf> (accessed November 19, 2009).

another important aspect of this new rule that violates the new majority's alleged interest in transparency: *The rule enacted today permits an elected justice of this Court to be removed from a case in secrecy.* At our November 5, 2009 conference, Justice MARKMAN proposed and the new majority repudiated an amendment that would require all appeals of a justice's initial decision to deny a motion for disqualification to be heard in an open session of this Court. So much for the openness and transparency that the new majority has continuously trumpeted.

Finally, as its proponents admit, this order is but an opening salvo for additional radical changes to this Court, *including the unconstitutional replacement of an elected justice with some other judge not elected to the Supreme Court.*[64] At our November 5, 2009 administrative conference, Chief Justice KELLY indicated her support for the new disqualification rule but also reiterated that it was only "the first step in the realization of a truly excellent rule." She considers it "essential" for this Court to have a rule that would allow the "replac[ement of] a disqualified justice with another judge for the purpose of hearing the case involved." As Justice CORRIGAN explained in great detail in her statement on the proposed disqualification rules,[65] unlike other states, the People of Michigan have not authorized this Court to appoint temporary justices. Rather, the Michigan Constitution provides that "[t]he supreme court *shall* consist of seven justices elected at non-partisan elections as provided by law."[66] Thus, this order appears to be preparatory for additional unconstitutional changes to this Court that would further disenfranchise Michigan voters.

This is truly a sad day for this Court, the citizens of Michigan, and for the judicial elective system that our citizens as sovereign have mandated. For all of these reasons, I dissent.

CORRIGAN, J., concurs with YOUNG, J.

MARKMAN, J. (*dissenting*). In place of a judicial disqualification rule that has worked satisfactorily for over 175 years to ensure an honorable Michigan Supreme Court

---

[64] As I explained in my statement accompanying the three proposed rules, Proposals Regarding Procedure for Disqualification of Supreme Court Justices, 483 Mich 1205, 1236 n 2 (2009): "[T]wo of [my] colleagues have made the radical proposal that justices *can* be replaced by other judicial officers. See *Adair v State of Michigan*, 474 Mich 1027, 1045, 1051 (2006)."

[65] Proposals Regarding Procedure for Disqualification of Supreme Court Justices, 483 Mich 1205, 1229-1234 (2009) (statement by CORRIGAN, J.).

[66] Const 1963, art 6, § 2.

and that remains employed by the United States Supreme Court and the majority of other state supreme courts, the new rule adopted by the majority, by establishing justices as the reviewing authority for the disqualification decisions of other justices and by adopting a vague "appearance of impropriety" standard applicable to all judges throughout the state: (a) will incentivize disqualification motions and thereby produce a considerable increase in the number of such motions and in the amount of time and effort devoted by this Court to addressing such motions; (b) will introduce an unprecedented degree of gamesmanship and politicization into the judicial process by enabling attorneys to influence which duly-elected justices will be allowed to participate in deciding their own cases and controversies; and (c) will seriously undermine the collegiality of this Court. In the end, the new rule is far more likely to reflect adversely upon the integrity of this Court than it is to enhance this Court's standards of conduct.

Although I opposed the adoption of the new rule, recognizing that there was majority support, I did move for the adoption of four amendments. Each of these was rejected by the same 4-3 vote. Most importantly, in my judgment, the majority refused to adopt the following amendment:

> All disqualification decisions other than the challenged justice's own initial decision shall be decided in public administrative session.

For this Court to disqualify an elected justice of this Court from participation in a case constitutes an action of extraordinary significance in a democratic system of judicial selection and should be undertaken in as open and as transparent a manner as possible. Indeed, it is hard to imagine a more consequential decision of this Court than that of some justices disqualifying an elected and coequal colleague. In view of the emphasis on transparency that has motivated this Court to adopt open administrative hearings, I cannot think of an action that more compellingly requires an open decision-making process than that of determining which justices will, and which justices will not, be allowed to participate in a case. The people are entitled to know why a justice whom they have elected to serve on this Court has been deprived of this right, and they are entitled to the opportunity to assess the rationale and motives of those who have rendered this judgment.

The majority also rejected the following amendment:

> A justice shall raise the issue of another justice's disqualification within 14 days after the former discovers the alleged basis for disqualification, including where a justice discovers the alleged basis during a non-public conference of the Court.

This amendment would have made clear that a justice may raise the issue of another justice's disqualification and that such disqualification could be predicated upon inappropriate conduct or behavior reflected during closed conferences. Tellingly, the single justice on this Court who has repeatedly cast public aspersions upon colleagues on the basis that they have committed unspecified misconduct and misbehavior at closed

conferences not only voted against this amendment, but also voted against the amendment requiring public deliberation on disqualification motions. Under this amendment, in the event a justice exhibits bias or prejudice for or against a party or an attorney, another justice would have 14 days from when they first became aware of this to move for that justice's disqualification. Absent an opportunity for a justice to sua sponte challenge the participation of another justice, statements of genuine bias or prejudice made in the context of confidential case discussions cannot be addressed, and attorneys exclusively will control the flow of disqualification motions, in particular, the few attorneys who have demonstrated a disproportionate inclination to repeatedly offering disqualification motions. Moreover, MRPC 8.3(b) requires "[a] lawyer having knowledge that a judge has committed a significant violation of the Code of Judicial Conduct that raises a substantial question as to the judge's honesty, trustworthiness, or fitness for office [to] inform the Judicial Tenure Commission." Given that the justices of this Court are all lawyers, it seems clear that our rules of conduct *require* us to raise disqualification issues if we believe that a justice should be disqualifying himself and is not doing so.

The majority likewise rejected the following amendment:

> Participation in a disqualification decision is subject to the same disqualification procedures as are applicable to a justice's participation in a particular case.

This amendment was intended to ensure the integrity of the disqualifying justices with reference to the justice whose disqualification is being sought. For instance, if Justice A, the subject of a disqualification motion, believes Justice B is prejudiced against him, or is himself partial for or against lawyers or parties in a particular case, Justice A in fairness ought to be permitted to challenge the propriety of Justice B's participation in the disqualification decision. For instance, if Justice A may be disqualified from participation because he received a campaign contribution from a particular lawyer or party, it cannot be proper for Justice B, whose opponent received a contribution from that same lawyer or party, or who himself received a contribution from the opposing lawyer or party, to participate in the disqualification decision. Individual justices, no less than lawyers and parties, are entitled to a fair hearing before their rights are adjudicated, and this cannot be obtained if there is a conflict of interest between himself and the decision maker. Can a justice who has campaigned against the challenged justice, or who has benefitted from political support from the party or attorney seeking the disqualification, or who has benefitted from political support from groups or organizations that might be advantaged by a justice's disqualification, decide any better than the challenged justice himself whether the latter can participate in a case?

Lastly, the majority rejected the following amendment:

> A decision by an individual justice to disqualify himself or herself from participation may be accompanied by a

statement that provides the reasons for such decision, but this
is not required.

This amendment would have maintained our existing practice of neither requiring nor prohibiting a statement by an individual justice deciding a motion. Making such statements mandatory is likely only to prove embarrassing to third persons who do not deserve to be embarrassed. Further, it is ironic that most of the justices in the majority have had no compunction in the context of even full-blown *opinions* of this Court in choosing not to offer even a whit of explanation for their positions.

As explained above, all four of my proposed amendments were rejected 4-3. So, now we have a rule that allows a majority of justices to decide behind closed doors which other justices can and cannot do what they were duly elected to do-- participate in deciding cases and controversies-- and without any regard to whether the justices making this decision are themselves biased in some manner. However, not only did the majority adopt a rule that confers upon itself the authority to determine which justices may participate in deciding what the law of this state is, but by adopting a novel "appearance of impropriety" standard-- which applies to the entire judiciary in this state, not merely to the justices of this Court-- it has enlarged its own discretion for rendering such decisions. The majority can now disqualify a justice from participation in a case even though it does not believe that the challenged justice is *actually biased*, but merely by reciting that it believes there to be some "appearance of impropriety."

The threshold problem, of course, with the new "appearance of impropriety" standard is its utter vagueness. What is an "appearance of impropriety," and from whose standpoint is the "appearance of impropriety" to be gauged? As this Court once explained, an "appearance of impropriety" standard will subject justices "to vague, subjective, and increasingly politically directed, allegations of misconduct, against which no justice could effectively defend himself or herself." *Adair v Michigan,* 474 Mich 1027, 1039 (2006) (statement of TAYLOR, C.J., and MARKMAN, J.), 1051 (statement of CORRIGAN, J.), 1053 (statement of YOUNG, J.). Further, an "appearance of impropriety" standard is likely to vitiate all other existing grounds for disqualification and create an ethical snare for judges. For example, under the new rule, MCR 2.003(C)(1)(e) requires a judge to disqualify himself where he had been a member of a law firm representing a party within the preceding two years, but MCR 2.003(C)(1)(b)(ii) requires a judge to disqualify himself if his participation would create an "appearance of impropriety." What if the judge has not been a member of the law firm that is representing a party for two years and one month? The judge would be able to participate under MCR 2.003(C)(1)(e), but would he be able to participate under MCR 2.003(C)(1)(b)(ii)? That is, if a judge would be required to disqualify himself if he has been a member of that law firm within the preceding two years, presumably because the chance of bias would be too substantial to allow his participation, could it truly be said that there was no longer any "appearance of impropriety" where that judge has not been a member of that law firm for two years and one month? Is that one month sufficient to alleviate any "appearance of impropriety"? Who knows? In the case of this Court, this decision will be left to the

discretion of other justices who have been no less involved in the political process than the justice whose disqualification has been sought. In other words, there will no longer be any rules, or "safe harbor," on the basis of which a judge can act. Instead, everything will be dependent upon ad hoc standards applied on a case-by-case basis by justices whose own biases and prejudices will apparently never be subject to challenge.

Furthermore, how does the "appearance of impropriety" standard operate in connection with statutes that specifically permit certain actions? For instance, MCL 169.252 and 169.269 specifically allow individual and political committee contributions to Michigan judicial candidates up to certain limits. "Such limits must be understood as clearly reflecting the Legislature's, and the people's, understanding that contributions in these amounts will not supply a basis for disqualification." *Adair,* 474 Mich at 1042 (statement of TAYLOR, C.J., and MARKMAN, J.), 1051 (statement of CORRIGAN, J.), 1053 (statement of YOUNG, J.). "If justices . . . were to recuse themselves on the basis of [legal] campaign contributions to their or their opponents' campaigns, there would be potential recusal motions in virtually every appeal heard by this Court, there would an increasing number of recusal motions designed to effect essentially political ends, and there would be a deepening paralysis on the part of the Court in carrying out its essential responsibilities." *Id.* For these reasons, I believe that where a justice has abided by all applicable statutes and specific court rule provisions that address the asserted basis for disqualification, disqualification is not required. That is, I would "decline to allow general allegations of impropriety that might overlap with specifically authorized or prohibited behavior and conduct to supersede [statutes and court rules] that specifically apply to the conduct in question." *In re Haley,* 476 Mich 180, 195 (2005). "Otherwise, such specific rules and [statutes] would be of little consequence if they could always be countermanded by the vagaries of an 'appearance of impropriety' standard." *Adair,* 474 Mich at 1039 (statement of TAYLOR, C.J., and MARKMAN, J.), 1051 (statement of CORRIGAN, J.), 1053 (statement of YOUNG, J.). However, such details did not appear to interest the majority during the court's recent deliberations, and the relationship between the court rules and the new "appearance of impropriety" standard will undoubtedly be resolved on a case-by-case basis at the majority's standardless discretion.

I am also uncertain as to whether, where a justice has been prohibited from participation in a case on the basis that he is biased against an attorney, that justice will *always* be prohibited from participation in a case in which that attorney is involved. In other words, once a majority of this Court has determined that a justice is biased against an attorney, will parties then be permitted to effectively choose which justices can participate in their cases by simply choosing that attorney to represent them? This would take forum shopping to an altogether new length.

An additional concern I have with the new rule pertains to the manner by which a justice is to responsibly review his colleagues' disqualification decisions. That is, what is the basis upon which a justice is to know whether another justice is or is not biased for or against a party or an attorney, or whether his disqualification is required on other grounds? For example, if another justice is accused of having a "more than de minimis

economic interest in the subject matter in controversy that could be substantially impacted by the proceeding," MCR 2.003(C)(1)(f), without knowing that justice's financial situation, how am I to render an intelligent and responsible decision? What may be a "de minimis economic interest" to one justice might be a substantial economic interest to another justice depending on the particular justice's financial situation. Are justices going to be required to disclose all information that may be pertinent to this decision? Am I then entitled to know the entirety of their, and their spouses', financial circumstances? Am I entitled to question such justice as to aspects of his financial circumstances? Am I entitled to review what I might consider to be relevant financial records or documents? Are fact-finding hearings to be required? If so, will these be done in public or behind closed doors like the disqualification decisions themselves? The majority was uninterested in discussing these and related questions when they were raised during debate.

For all these reasons, and especially for those set forth in the first paragraph of this statement, I strongly dissent from the adoption of the new disqualification rule. The majority will doubtlessly enjoy plaudits from those who fail to look beneath the surface of the majority's claims of "reform." However, as time goes by, it will become increasingly clear that the majority has replaced a time-tested disqualification procedure with one that will lead inevitably to politicization, gamesmanship, and acrimony.[67]

Staff Comment: The amendments adopted by the Court in this order explicitly apply the judicial disqualification rule to all state judges, including Supreme Court Justices. In addition, the amendments revise disqualification standards and establish procedures for the disqualification process.

---

[67] In once again revealing a confidential communication of this Court, Justice WEAVER also once again fails to supply fair and necessary context. In suggesting in note 10 of her dissent that I agree with her that the Court "adopted" the new disqualification rule, she cites my statement that the majority "intended" the rule to become "effective immediately." I continue to believe this was the majority's intention. However, Justice WEAVER fails to note my related observation at conference that courts "speak through their orders," not through their subjective intentions. Every other justice, except for Justice WEAVER, agreed with this proposition and concluded that the new rule had not yet been "adopted," but would only become so upon the issuance of an order. To subject ourselves to the new rule, Justice HATHAWAY and I have chosen to wait until such order has been issued before deciding pending disqualification motions.



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

November 25, 2009

Clerk

APPENDIX A

# The Detroit News

## www.detnews.com

November 18, 2009

http://detnews.com/article/20091118/OPINION01/911180309

# Letter: New court rules may let minority win

The Nov. 10 editorial ("Justice disqualified") notes that "New rules on recusal of state Supreme Court members could cause problems with subjective standard." It is worse than that. The promulgation of the four-justice Michigan Supreme Court majority rule that permits justices to oust other justices from consideration of a case is a seizure of power without authority that is unprecedented in the history of the court.

The majority of justices speak for the court. But nothing in our Constitution gives a majority of justices -- and here, only a majority of justices who have not been challenged by a litigant, which might be a minority of the court -- the authority to decide whether another justice or justices may sit on a case. Undoubtedly some litigants will, calculating on past decisions that they are likely to lose 4-3 in a case, challenge two justices of what they perceive will be the majority.

Under the new recusal rule, the remaining justices will vote on whether the challenged justices may sit, and in a 3-2 vote the three justices who might be in the minority in the case may oust two other justices from the case.

In the U.S. Supreme Court, each justice individually decides questions of recusal in any case, and there is no recourse to either the chief justice or the rest of the court should a justice not excuse himself or herself from a case.

This is precisely because the members of that court understand the limits on their authority, which, unfortunately, four members of our state Supreme Court do not.

**Tim Baughman**, Royal Oak

© Copyright 2009 The Detroit News. All rights reserved.

# The Detroit News

www.detnews.com

November 19, 2009

http://detnews.com/article/20091119/OPINION01/911190343

# Commentary: Beware power grab for Michigan court

*DAN PERO*

There's a discredited practice in politics: If you can't win the game, change the rules. The majority of justices on the Michigan Supreme Court is attempting to do just that by making it far easier to dismiss justices elected by Michigan voters from controversial cases and blatantly shift the balance of power on the court.

Michigan Supreme Court justices historically have voluntarily removed themselves from cases they cannot hear impartially. Under the new rules, the well-defined "actual bias" test for disqualification will be replaced by a fuzzy "appearance of impropriety" standard.

The definition of what constitutes the perception of bias is a moving target. Does a $1,000 campaign contribution create the "appearance" that a justice cannot be impartial? Who knows?

What happens if a trial lawyer compares a judge to "Adolf Hitler and Goebbels," as Geoffrey Fieger has done? Isn't it easy to claim there is at least an "appearance" that a judge who has been tagged with that epithet shouldn't rule in cases involving that lawyer? What's to stop an unscrupulous attorney from smearing a justice so the justice is removed from cases down the road?

The new rules also make the disqualification process less transparent and accountable.

Under the old system, litigants could request that individual justices recuse themselves, but the justices made the ultimate decision on whether to hear a case. This worked well in Michigan because justices knew if they abused this process or ruled on cases in which there was clear bias, voters could throw them off the court in the next election.

The new rules, however, give justices the power to request (and achieve) the removal of their colleagues. This policy invites retaliatory recusal demands and endless bias accusations, especially given the petty and vindictive proclivities of many court members.

Even worse, justices will be allowed to vote on disqualification challenges with no public oversight. Any justice can be removed from any case for any reason -- and the court will never have to justify or even explain its actions to the voters.

This is an especially ironic twist since the new liberal majority has railed for more transparency. Justice Elizabeth Weaver has made it her mantra. Justice Diane Hathaway campaigned on it. And Chief Justice Marilyn Kelly promised it.

There's not a shred of evidence the existing rules failed to keep Michigan's high court impartial, giving this entire exercise the whiff of partisan politics and ideological gamesmanship. In the future, any combination of four justices on the seven-member court can temporarily unseat a democratically elected colleague and shift the direction of the court. The result will be heightened cynicism about the judicial branch.

The court's new recusal rules are the culmination of an effort to get conservative justices off the court -- or at

least push them to the sidelines. If the court does so, it will undermine the ability of Michigan voters to decide who is going to hear the cases that affect their lives, jobs and businesses.

*Dan Pero, former chief of staff to Gov. John Engler, is president of the American Justice Partnership, a national organization headquartered in Lansing that focuses on enacting legal reform at the state level. E-mail comments to letters@detnews.com">letters@detnews.com*

---

© Copyright 2009 The Detroit News. All rights reserved.

STATE OF MICHIGAN
SUPREME COURT



MEMORANDUM
FOR COURT USE ONLY

TO:  The Justices
     cc:  Corbin Davis, Mike Schmedlen, and
          Danilo Anselmo

DATE:  November 2, 2009

FROM:  Justice Maura Corrigan

SUBJECT:  ADM 2009-04, #3 on 11/5/09 administrative agenda

_____

In light of my call for further study of *Caperton v A T Massey Coal Co, Inc*, 556 US ___ (2009); 129 S Ct 2252 (June 8, 2009),[1] I would like to share my follow-up research with regard to whether and how *Caperton* bears on courts' general recusal policies. The *Caperton* opinion itself, courts' and commentators' interpretations of *Caperton*, and court practices in the wake of *Caperton* have convinced me that *Caperton* applies very narrowly and does not suggest that due process requires us to change our recusal practices. Indeed, this Court would be a true outlier if we read *Caperton* to require evidentiary hearings or a vote by the full Court in order to resolve recusal motions consistent with due process principles. The fact that *Caperton* does not require such changes to our historical recusal practice provides additional support for my vote in favor of alternative A.

First and foremost, the *Caperton* majority took pains to explain the limited nature of its holding. Indeed, it devoted Part IV of the opinion to clarifying that the Court's "decision today addresses an extraordinary situation where the Constitution requires recusal." Slip op at 16. It

_____

[1] See my statement accompanying the order denying the motion for recusal in *United States Fidelity Insurance & Guaranty Co v Michigan Catastrophic Claims Assoc*, 484 Mich 1, 49-60 (2009).

specified: "the facts now before us are extreme by any measure." *Id.* at 17.[2] Otherwise, it acknowledged that "'most matters relating to judicial disqualification [do] not rise to a constitutional level.'" *Id.* at 6, quoting *FTC v Cement Institute*, 333 US 683, 701 (1948).

Recall that *Caperton* held that a state supreme court justice was disqualified from hearing a case involving a corporate party whose chairman and CEO made "extraordinary efforts to get [the justice] elected" by expending $3 million to support the justice's campaign. *Id.* at 2-3, 11. *Caperton* explicitly limited itself to "the context of judicial elections," *id.* at 11, and, more specifically, to extreme facts when a party directs or significantly contributes to a campaign while that party's case is pending. See *id.* at 13 ("Not every campaign contribution by a litigant or attorney creates a probability of bias that requires a judge's recusal, but this is an exceptional case."), 14 ("[T]here is a serious risk of actual bias ... when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent."), 15 ("The temporal relationship between the campaign contributions, the justice's election, and the pendency of the case is ... critical."), 17 ("The parties point to no other instance involving judicial campaign contributions that presents a potential for bias comparable to the circumstances in this case.")

Accordingly, I tend to agree with the following observations by former Texas Chief Justice Thomas Phillips, who authored the amicus brief in *Caperton* on behalf of the Conference of Chief Justices, concerning the limited scope of *Caperton*:

---

[2] And see *id.* at 17 ("[E]xtreme cases often test the bounds of established legal principles, and sometimes no administrable standard may be available to address the perceived wrong"; "[t]his Court's recusal cases ... deal[] with extreme facts ... .").

2

Some have suggested that judges can never rule in any case where parties to a case or their attorneys are donors. It does no such thing. The holding, as I read it, is that due process is only violated when "[1] a person [2] with a personal stake in a particular case [3] had a significant [4] and disproportionate influence [5] in placing the judge on the case ... [6] when the case was pending or imminent." Given how narrow that holding is, I'm not sure *Caperton* will ever be direct precedent for another recusal. [Coping With 'Caperton': A Q&A With Former Texas Chief Justice, Tony Mauro, The National Law Journal June 11, 2009.]

Cases interpreting *Caperton* have reached similar a conclusion, that is: *Caperton* is limited to extreme facts in the context of campaign support in judicial elections. For just a few examples see *Rhiel v Hook (In re Johnson)*, 408 BR 123, 127 (Bankr, SD Ohio 2009) (*Caperton* is limited to "the specific issue of recusal 'in the context of judicial elections'"); *Ala Dep't of Pub Safety v Prince*, 2009 Ala Civ App LEXIS 510 (Oct 2, 2009) (quoting Chief Justice Roberts' dissent to observe that it is unclear whether *Caperton* applies beyond financial support in judicial elections but, in any event, the majority made clear that *Caperton* was "an exceptional case" that presented "extreme facts" and concluding that the facts in the case before it "are not the 'extreme facts' of *Caperton*"); *Marek v Florida*, 14 So 3d 985, 1000 (Fla 2009) (rejecting a defendant's claim that his constitutional right to due process was violated under *Caperton* when the same judge presided over his 1984 sentencing and the 1988 evidentiary hearing on his initial motion for postconviction relief; *Caperton's* "extraordinary facts regarding a litigant's campaign contributions to a state supreme court justice" are "irrelevant" to this case); *South Dakota v List*, 2009 SD 73, 8 (SD 2009) (citing *Caperton* for the proposition that "most matters relating to judicial disqualification [do] not rise to a constitutional level").

Perhaps most significantly, the few state courts I have discovered that have publicly considered whether *Caperton* bears on their recusal practices have primarily addressed the

3

case's ramifications for rules concerning contribution limits to judicial elections. These states have not read *Caperton* to require evidentiary hearings or a vote by unchallenged judges or justices.[3] For example, the Supreme Court of Nevada's Commission on the Amendment to the Nevada Code of Judicial Conduct issued a supplementary report recommending two additional rule changes in response to *Caperton*; both changes address recusal on the basis of a judge's financial or electoral campaign support from a party or attorney.[4] Similarly, on October 28, 2009, the Wisconsin Supreme Court conducted a hearing on petitions asking whether to amend the Supreme Court Rules concerning judicial campaign contributions and whether there are circumstances when recusal is required if a party or lawyer in an action "previously made a campaign contribution to or spent money on a media campaign relating to a judicial election for

---

[3] At least one state also considered, but rejected, rephrasing its general recusal standards in reaction to *Caperton*. According to a September 2009 report from the Washington Supreme Court Task Force on the Code of Judicial Conduct, a minority of the task force would have adopted the 2007 ABA Model Code for Rule 1.2 of the Code of Judicial Conduct on Promoting Confidence in the Judiciary; based in part on *Caperton,* the version of the rule preferred by the minority would direct judges to avoid not just impropriety, but the "appearance of impropriety." See<http://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20Code%20of%20J udicial%20Conduct%20Task%20Force%20Committe/Final%20CJC%20%20Task%20Force% 20Report%20Sept%2009.pdf> (accessed October 28, 2009). The proposed new Washington State Code of Judicial Conduct also addresses disqualification of a judge on the basis of monetary campaign support in excess of the statutory direct contribution limits. See proposed Rule 2.11(A)(4) and comment [7], <http://www.courts.wa.gov/committee/?fa=committee. home&committee_id=141> (accessed November 2, 2009).

The Chief Justice of the Supreme Court of Ohio informed me that Ohio's high court discussed *Caperton* formally once and decided not to take any action; Ohio's justices, like myself, are interested to see whether other states find reform necessary.

[4] See <http://nevadajudiciary.us/index.php/viewdocumentsandforms/Commission-Files/Nevada-Judicial-Conduct-Code-Commission/Supplemental-Report/> (accessed November 2, 2009).

a judge who is presiding in the case."[5] But thus far, my research has not revealed that any state supreme court has read *Caperton* even to *potentially* require evidentiary hearings or a vote of the full Court. It is worth further noting that the United States Supreme Court appears not to have amended its own recusal process—which comports with our own historical practice—in the wake of *Caperton*.[6]

Along these lines, I again note the comments, published by Michigan Lawyers Weekly, of Wayne County Assistant Prosecuting Attorney Timothy Baughman concerning *Caperton*:

> *Caperton* is a case about standards and not about the identity of the decision-maker. . . .
>
> * * *
>
> Nothing in *Caperton* requires that the decision on a recusal motion be reviewed by another justice or body of justices. For the Michigan Supreme Court [to continue] to follow the practice of the U.S. Supreme Court is perfectly permissible, so long as a system of "objective rules" exists. [ *'Caperton' was about recusal standards, not decision maker*, Michigan Lawyers Weekly, June 22, 2009, p 7.]

For these reasons, my study of *Caperton* convinces me that it does not require any changes to our recusal rules. Accordingly, I reiterate my support for alternative A in this file,

---

[5] See <http://www.wicourts.gov/supreme/petitions_audio.htm> (accessed October 29, 2009), rule petitions 08-16, 08-25, 09-10 and 09-11. The originating petition, 08-16, appears to have been filed before *Caperton* was decided, but the Court accepted an amendment the petition in light of *Caperton*. See <http://www.wicourts.gov/supreme/docs/0816petitionamend.pdf> (accessed October 29, 2009).

[6] The primary difference between our practice and that of SCOTUS is the fact that a party who wishes to challenge a Michigan Supreme Court justice's recusal decision has another level of recourse; he may appeal that decision to SCOTUS. Thus I find it particularly noteworthy that SCOTUS has not concluded that due process requires unchallenged SCOTUS justices to bless or reverse an individual SCOTUS justice's recusal decision although there is no higher body to which the movant may appeal the decision. Clearly SCOTUS continues to believe that individual justices are generally competent to decide motions for their recusal.

which effectively codifies our historical recusal practice and does not require a vote of the Court under any circumstances.

# MEMORANDUM

TO:      The Justices
         cc: Corbin Davis & Mike Schmedlen

FROM:    Justice Robert P. Young, Jr.

RE:      ADM 2009-04, Disqualification

DATE:    November 19, 2009

---

Before issuing an order adopting the rule on disqualification, the members of this Court should seriously consider the following amendments to MCR 2.003. They are designed primarily to assure minimal due process and to clarify the procedures used when this Court reviews as an appellate body a Justice's decision to deny a motion for recusal. I will discuss in turn my reasons for proposing each of the amendments. I provide at the conclusion of this memo the entire rule as voted on November 5, 2009, containing all of my proposed amendments in redline.

## PROPOSED DUE PROCESS AMENDMENTS

- As discussed at our last ADM conference, I believe that the timing requirement for filing disqualification motions in the Supreme Court requires more precision than the language contained in Justice Hathaway's proposal specified. (This is the subject matter of my "friendly amendment" offered before our vote on Justice Hathaway's proposal.) I have split the "Time for Filing" subsection into four parts (subsections (D)(1) through (D)(4)). There is proposed one subsection for procedures respectively in the trial court, the Court of Appeals, and this Court, and a fourth subsection concerning the effect of an untimely motion. Consistent

with my proposal at conference, I have specified that the appellant must file a motion for disqualification with the application if the appellant knows the basis for disqualification at that point and that the appellee must file a motion for disqualification within 28 days of the application if the appellee then knows the basis for disqualification. That way, we are aware of potential grounds for disqualification before acting on the application for leave to appeal. I would also retain the previous language concerning the effect of an untimely proposal and specify that a judge shall not consider a motion made after a case has already been decided. (I previously provided Justice Hathaway with language similar to this proposal, but she has not responded; this language is slightly revised from that that I supplied to her right after the last ADM conference.)

- I would clarify that, when the rule refers to an appeal on disqualification being decided by "the *entire* Court," this includes the challenged justice. This is already implied in the plain text of the current rule – "[t]he entire Court shall then decide the motion for disqualification de novo" – and so my revisions would merely clarify the rule as enacted. These clarifications are contained in subsection (D)(6)(b). If this proposal is repudiated, and a targeted justice is ineligible to hear *any* appeal on a motion for disqualification, there is the possibility, when multiple justices are targeted, that an appeal on disqualification will run afoul of the quorum requirement of MCL 600.211(3), requiring "a majority of justices...for hearing cases and transacting business."

- I continue strongly to support Justice Markman's demand for transparency in the disqualification process. A disqualification matter to be decided under the new

2

rule as an appeal to the entire Court is not one on the merits and thus is not subject to the same kind of confidentiality that attends our merit discussions of pending appeals. Accordingly, I would expressly require that any appeal to the entire Court on a motion for disqualification be heard and decided in an open session of this Court. This procedure is contained in subsection (D)(6)(b)(ii).

- The removal of a sitting Justice against his or her will is a serious matter trenching upon the right to execute the duties of office to which the Justice was elected as well as an infringement on the right of electors who placed the Justice in office. Heretofore, only an appeal to the Supreme Court of the United States could reverse a Justice's determination regarding a motion to disqualify. In interposing itself in this decision as an appellate body, this Court must afford the targeted Justice no fewer rights than he enjoyed in such an appeal to the Supreme Court of the United States on a denial of a motion to disqualify. I would clarify that a justice subject to a motion for disqualification is entitled to basic due process rights: that the appeal is limited to the grounds stated in the motion for recusal and that the justice be allowed to retain counsel in the matter and submit a brief in response to the motion for disqualification. The procedural requirements for filing such a brief are consistent with the filing of reply briefs in the Court of Appeals and this Court. These proposals are contained in subsections (D)(6)(b)(i) and (ii).

- If due process means anything – particularly in the disqualification setting where this issue is pivotal – a targeted Justice is most assuredly entitled to an *impartial*

3

arbiter.[1] Where personal and political biases could affect the decision-making of members of this Court in the new disqualification appeal process, I cannot imagine that due process demands less than the right to challenge such potential biases of the decision-makers in this appellate procedure. Therefore, I would amend the rule to ensue that this cardinal due process right is preserved, such that a targeted justice facing an appellate review of his refusal to disqualify can challenge the potential biases of other members of this Court. The substance of this rule is consistent with Justice Markman's failed motion at the last ADM discussion. However, I have provided specific procedural requirements for a judge to challenge the decision-maker in such an appeal. This is contained in subsection (D)(6)(b)(iii).

- Due process also demands an adequate opportunity for a challenged justice to be heard.[2] Sometimes, this will entail an evidentiary hearing. I have therefore proposed a procedure for this Court taking evidence, contained in subsection (D)(6)(b)(ii).

- I continue to be concerned with the First Amendment implications of our new recusal rules. I propose amending subsection (C)(2)(b) to provide that "A judge is not disqualified based solely upon campaign speech protected by *Republican Party of Minn v White*, 536 US 765 (2002)." This is consistent with Justice Cavanagh's previous recommended revision. Moreover, to keep our court rules

---

[1] "A hearing before an unbiased and impartial decisionmaker is a basic requirement of due process." *Crampton v Dep't of State*, 395 Mich 347, 351 (1975).

[2] "The fundamental requisite of due process of law is the opportunity to be heard." *Dow v State of Michigan*, 396 Mich 192, 205 (1976) (internal quotation omitted).

4

in accordance with the *White* decision, I have specified that campaign speech shall not be the basis for recusal under the "appearance of impropriety" standard in the former subsection (C)(1)(b)(ii), which I propose to be renumbered (C)(1)(c).

- I would clarify when *Caperton* requires a justice's disqualification by using further language consistent with the decision. This is contained in subsection (C)(1)(b).

- I would clarify the procedure by which a justice may challenge another justice's participation in a particular case. I propose amending subsection (B) expressly to allow a justice to raise another justice's participation in a case, and the procedure required to challenge another justice's participation is parallel with the procedure required of a party and is provided in subsection (D)(3). The obligation to challenge arises when a justice becomes aware of the basis for disqualification in a particular case.

- I would specify that a judge may not be subject to disqualification simply because the parties agree among themselves that the judge should be disqualified. I propose adding a new subsection (B)(2)(c) to address this situation.

- Finally, while I do not object to changing the term "remittal" to "waiver" in the new subsection (E), I believe the language in the current rule provides more protection for the parties and a more structured procedural mechanism than the provision as revised. In particular, the previous language specified that parties may not waive a judge's participation in the face of personal bias or prejudice and that the waiver must be made out of the presence of the judge. I cannot think of a single justification for asking parties to waive a judge's *actual* bias and believe that the draftsman of the revised provision inadvertently omitted this

5

language from the current rule in attempting to restate it. Therefore, I would retain the current language in the rule.

I have indicated in redline my proposed amendments to the rule. The baseline language in subsection (D)(1) is the language that Justice Hathaway initially proposed as the deadline for filing a motion for disqualification, but which was agreed to be reworked at our next ADM conference.

**THE RULE VOTED ON WITH JUSTICE YOUNG'S PROPOSED AMENDMENTS**

**Rule 2.003    Disqualification of Judge**

(A)    Applicability.  This rule applies to all judges, including justices of the Michigan Supreme Court, unless a specific provision is stated to apply only to judges of a certain court.  The word "judge" includes a justice of the Michigan Supreme Court.

(B)    Who May Raise.  A party may raise the issue of a judge's disqualification by motion or the judge may raise it.  Any justice on the Supreme Court may raise the issue of another justice's disqualification when grounds in a particular case become known.

(C)    Grounds.  A judge is disqualified when the judge cannot impartially hear a case, including but not limited to instances in which:

(1)    Disqualification of a judge is warranted for reasons that include, but are not limited to, the following:

(a)    The judge is biased or prejudiced for or against a party or attorney.

(b)    The judge, based on objective and reasonable perceptions, has either (i) a serious risk of actual bias impacting the due process rights of a party when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election

6

campaign when the case was pending or imminent, as enunciated in *Caperton v Massey*, ___ US ___ (2009).

(c) The judge, based on objective and reasonable perceptions, or (ii) has failed to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct. Recusal shall not be required under this section based on a judge's campaign speech.

(cd) The judge has personal knowledge of disputed evidentiary facts concerning the proceeding.

(de) The judge has been consulted or employed as an attorney in the matter in controversy.

(ef) The judge was a partner of a party, attorney for a party, or a member of a law firm representing a party within the preceding two years.

(fg) The judge knows that he or she, individually or as a fiduciary, or the judge's spouse, parent, or child wherever residing, or any other member of the judge's family residing in the judge's household, has more than a de minimis economic interest in the subject matter in controversy that could be substantially impacted by the proceeding.

(gh) The judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

   (i) is a party to the proceeding, or an officer, director or trustee of a party;

   (ii) is acting as a lawyer in the proceeding;

   (iii) is known by the judge to have a more than a de minimis interest that could be substantially affected by the proceeding; or

   (iv) is to the judge's knowledge likely to be a material witness in the proceeding.

(2) Disqualification Not Warranted.

   (a) A judge is not disqualified merely because the judge's former law clerk is an attorney of record for a party in an action that is before the judge or is associated with a law firm representing a party in an action that is before the judge.

7

(b)  A judge is not disqualified based solely upon campaign speech protected by *Republican Party of Minn v White*, 536 US 765 (2002), ~~so long as such speech does not demonstrate bias or prejudice or an appearance of bias or prejudice for or against a party or an attorney involved in the action.~~

~~(b)~~(c)  A judge shall not be subject to disqualification based solely on the agreement of the parties.

(D)  Procedure.

(1) *Time for Filing in the Trial Courts.*  ~~For motions in the trial court, t~~To avoid delaying trial and inconveniencing witnesses, if a party is aware of a basis for a motion to disqualify a judge before filing its initial pleading, the party must file a motion to disqualify with the initial pleading.  Otherwise, the party must file a motion to disqualify ~~be filed~~ within 14 days after the moving party discovers the ground for disqualification.  If the discovery is made within 14 days of the trial date, the motion must be made forthwith.  ~~All motions in the Court of Appeals must be filed within 28 days of the disclosure to the parties of the judge's assignment to the case or within 28 days of the discovery of the grounds for disqualification, whichever is later.  All motions in the Supreme Court must be filed within 28 days of the order granting leave or oral argument on the application for leave, or within 28 days of the discovery of the grounds for disqualification, whichever is later.  Untimely motions in the trial court, Court of Appeals or Supreme Court may be granted for good cause shown.~~

(2) *Time for Filing in the Court of Appeals.*  If a party is aware of a basis for a motion to disqualify a Court of Appeals judge assigned to adjudicate the appellant's case, the party must file a motion to disqualify within 14 days after receiving notice of the judges assigned to the appellant's case.  Otherwise, a party must file a motion to disqualify within 14 days after the party discovers or should have discovered the basis for disqualification.  If a party discovers the basis for disqualification within 14 days before a scheduled oral argument or argument on the application for leave to appeal, the motion must be made forthwith.

(3) *Time for Filing in the Supreme Court.*  If an appellant is aware of a basis for a motion to disqualify a justice before the application for leave is filed, the appellant must file a motion to disqualify with the application.  Otherwise, the appellant must file a motion to disqualify within 28 days after the appellant discovers or should have discovered the basis for disqualification.  If an appellee is aware of a basis for a motion to disqualify a justice, the appellee must file a motion to disqualify within 28 days after the application is filed.  Otherwise, an appellee must file a motion to disqualify within 28 days after the

8

appellee discovers or should have discovered the basis for disqualification. If any party discovers the basis for disqualification within 28 days before a scheduled oral argument or argument on the application for leave to appeal, the motion must be made forthwith.

If a justice is aware of a basis of another justice's disqualification when an application for leave is filed, the justice must raise this question before the order to enter date. Otherwise, a justice must raise the issue of disqualification within 28 days after the justice discovers or should have discovered the basis for disqualification. If a justice discovers the basis for disqualification within 28 days before a scheduled oral argument or argument on the claim or application for leave to appeal, the issue must be raised forthwith.

(1)(4) *Effect of Untimely Motion.* If a motion is not timely filed in the trial court, the Court of Appeals, or the Supreme Court, untimeliness, including delay in waiving jury trial, is a factor in deciding whether the motion should be granted. No judge shall consider a motion filed after an order resolving the case has been entered.

(52) *All Grounds to be Included; Affidavit.* In any motion under this rule, the moving party must include all grounds for disqualification that are known at the time the motion is filed. An affidavit must accompany the motion.

(63) *Ruling.*

(a) For courts other than the Supreme Court, the challenged judge shall decide the motion. If the challenged judge denies the motion,

(i) in a court having two or more judges, on the request of a party, the challenged judge shall refer the motion to the chief judge, who shall decide the motion de novo;

(ii) in a single-judge court, or if the challenged judge is the chief judge, on the request of a party, the challenged judge shall refer the motion to the state court administrator for assignment to another judge, who shall decide the motion de novo.

(b) In the Supreme Court, if a justice's participation in a case is challenged by a written motion or if the issue of participation is raised by the justice himself or herself or another justice, the challenged justice shall decide the issue and publish his or her reasons about whether to participate. If the challenged justice denies the motion for disqualification, a party may move for the motion to be decided by the entire Court.

9

(i)    The entire Court, including the justice who is the subject of the appeal and any other justice whose participation is challenged in the case, except a justice removed pursuant to subsection (iii), shall then decide the motion for disqualification de novo. In deciding the motion for disqualification, the Court shall be limited to the grounds raised in the motion itself. The Court's decision shall include the reasons for its grant or denial of the motion for disqualification. A justice may only be disqualified from a case upon the vote of a majority of all justices on the Court. The Court shall issue a written order containing a statement of reasons for its grant or denial of the motion for disqualification. Any concurring or dissenting statements shall be in writing, including that of the challenged justice.

(ii)    Upon motion by the challenged justice, the Court shall conduct an evidentiary hearing, governed by the Michigan Court Rules and the Michigan Rules of Evidence, to determine any material facts necessary to the resolution of the motion for disqualification. Any appeal on the motion for disqualification decided by the entire Court, including any evidentiary hearing, must be made in an open session of the Court. The challenged justice may retain counsel and file a brief in response to the motion to appeal denial of disqualification. The responsive brief must be filed and served within 21 days after the party moving for disqualification appeals the justice's decision to deny the motion for disqualification.

(i)(iii)    Any appeal on the motion for disqualification must be resolved by a neutral arbiter following the Michigan Court Rules and the Michigan Rules of Evidence. The justice may challenge the participation of any justice to hear an appeal on the motion for disqualification by indicating the basis for any such disqualification of any other justice sitting on the appeal. Such claim of disqualification of a justice is subject to the procedures contained in this rule and shall be resolved in accordance with the appropriate substantive rules for disqualification prior to any decision on the appeal of the original motion for disqualification.

(74)    If Disqualification Motion Is Granted.

    (a)    For courts other than the Supreme Court, when a judge is disqualified, the action must be assigned to another judge of the

10

same court, or, if one is not available, the state court administrator shall assign another judge.

(b) In the Supreme Court, when a justice is disqualified, the underlying action will be decided by the remaining justices of the Court.

(E) Waiver of Disqualification. If it appears that there may be grounds for disqualification, the judge may ask the parties and their lawyers to consider, out of the presence of the judge, whether to waive disqualification. If, following disclosure of any basis for disqualification other than personal bias or prejudice concerning a party, the parties without participation by the judge, all agree that the judge should not be disqualified, and the judge is then willing to participate, the judge may participate in the proceedings. The agreement shall be in writing or placed on the record. Parties to the proceeding may waive disqualification even where it appears that there may be grounds for disqualification of the judge. Such waiver may occur whether the grounds for disqualification were raised by a party or by the judge, so long as the judge is willing to participate. Any agreement to waive disqualification must be made by all parties to the litigation and shall be in writing or placed on the record.

11

EXHIBIT C

# MEMORANDUM

TO:      The Justices
             cc: Corbin Davis & Mike Schmedlen

FROM:    Justice Robert P. Young, Jr.

RE:      ADM 2009-04, Disqualification

DATE:    December 7, 2009

---

For the convenience of members of the Court, I am reprinting, below, all of my proposed amendments to MCR 2.003. In addition to the amendments that I proposed on November 19, 2009, I include my proposed amendments to the deadline for filing a motion, circulated to the Court on December 4, 2009, and Justice Markman's proposed amendments, circulated to the Court this morning. I also reprint my initial explanations for these proposed amendments, as refined to include the more recent proposals.

## PROPOSED DUE PROCESS AMENDMENTS

- I have split the "Time for Filing" subsection into four parts (subsections (D)(1) through (D)(4)). There is proposed one subsection for procedures respectively in the trial court, the Court of Appeals, and this Court, and a fourth subsection concerning the effect of an untimely motion. As to motions in this Court, I have specified that the appellant must file a motion for disqualification with the application if the appellant knows the basis for disqualification at that point. All other motions must be filed with 28 days of discovery of the grounds for disqualification. That way, we are aware of potential grounds for disqualification

before acting on the application for leave to appeal. I would also retain the previous language concerning the effect of an untimely proposal.

- Additionally, I believe that we should require a party to file a motion to disqualify as soon as it is aware of a basis for disqualification – particularly on the eve of trial or oral arguments – and I want the rule to specify this. Justice Hathaway's proposed language already maintains this requirement for motions in the *trial court*: my proposed language would provide parallel requirements for the Court of Appeals and Supreme Court.

- I would clarify that, when the rule refers to an appeal on disqualification being decided by "the *entire* Court," this includes the challenged justice. This is already implied in the plain text of the current rule – "[t]he entire Court shall then decide the motion for disqualification de novo" – and so my revisions would merely clarify the rule as enacted. These clarifications are contained in subsection (D)(6)(b). If this proposal is repudiated, and a targeted justice is ineligible to hear *any* appeal on a motion for disqualification, there is the possibility, when multiple justices are targeted, that an appeal on disqualification will run afoul of the quorum requirement of MCL 600.211(3), requiring "a majority of justices...for hearing cases and transacting business."

- I continue strongly to support Justice Markman's demand for transparency in the disqualification process. A disqualification matter to be decided under the new rule as an appeal to the entire Court is not one on the merits and thus is not subject to the same kind of confidentiality that attends our merit discussions of pending appeals. Accordingly, I would expressly require that any appeal to the

2

entire Court on a motion for disqualification be heard and decided in an open session of this Court. This procedure is contained in subsection (D)(6)(b)(ii).

- The removal of a sitting Justice against his or her will is a serious matter trenching upon the right to execute the duties of office to which the Justice was elected as well as an infringement on the right of electors who placed the Justice in office. Heretofore, only an appeal to the Supreme Court of the United States could reverse a Justice's determination regarding a motion to disqualify. In interposing itself in this decision as an appellate body, this Court must afford the targeted Justice no fewer rights than he enjoyed in such an appeal to the Supreme Court of the United States on a denial of a motion to disqualify. I would clarify that a justice subject to a motion for disqualification is entitled to basic due process rights: that the appeal is limited to the grounds stated in the motion for recusal and that the justice be allowed to retain counsel in the matter and submit a brief in response to the motion for disqualification. The procedural requirements for filing such a brief are consistent with the filing of reply briefs in the Court of Appeals and this Court. These proposals are contained in subsections (D)(6)(b)(i) and (ii).

- If due process means anything – particularly in the disqualification setting where this issue is pivotal – a targeted Justice is most assuredly entitled to an *impartial* arbiter.[1] Where personal and political biases could affect the decision-making of members of this Court in the new disqualification appeal process, I cannot

---

[1] "A hearing before an unbiased and impartial decisionmaker is a basic requirement of due process." *Crampton v Dep't of State*, 395 Mich 347, 351 (1975).

3

imagine that due process demands less than the right to challenge such potential biases of the decision-makers in this appellate procedure. Therefore, I would amend the rule to ensue that this cardinal due process right is preserved, such that a targeted justice facing an appellate review of his refusal to disqualify can challenge the potential biases of other members of this Court. The substance of this rule is consistent with Justice Markman's failed motion at the last ADM discussion. However, I have provided specific procedural requirements for a judge to challenge the decision-maker in such an appeal. This is contained in subsection (D)(6)(b)(iii).

- Due process also demands an adequate opportunity for a challenged justice to be heard.[2] Sometimes, this will entail an evidentiary hearing. I have therefore proposed a procedure for this Court taking evidence, contained in subsection (D)(6)(b)(ii).

- I continue to be concerned with the First Amendment implications of our new recusal rules. I propose amending subsection (C)(2)(b) to provide that "A judge is not disqualified based solely upon campaign speech protected by *Republican Party of Minn v White*, 536 US 765 (2002)." This is consistent with Justice Cavanagh's previous recommended revision. Moreover, to keep our court rules in accordance with the *White* decision, I have specified that campaign speech shall not be the basis for recusal under the "appearance of impropriety" standard in the former subsection (C)(1)(b)(ii), which I propose to be renumbered (C)(1)(c).

---

[2] "The fundamental requisite of due process of law is the opportunity to be heard." *Dow v State of Michigan*, 396 Mich 192, 205 (1976) (internal quotation omitted).

4

- I would clarify when *Caperton* requires a justice's disqualification by using further language consistent with the decision. This is contained in subsection (C)(1)(b).

- I would clarify the procedure by which a justice may challenge another justice's participation in a particular case. I propose amending subsection (B) expressly to allow a justice to raise another justice's participation in a case, and the procedure required to challenge another justice's participation is parallel with the procedure required of a party and is provided in subsection (D)(3). The obligation to challenge arises when a justice becomes aware of the basis for disqualification in a particular case.

- I would specify that a judge may not be subject to disqualification simply because the parties agree among themselves that the judge should be disqualified. I propose adding a new subsection (B)(2)(c) to address this situation.

- Finally, while I do not object to changing the term "remittal" to "waiver" in the new subsection (E), I believe the language in the current rule provides more protection for the parties and a more structured procedural mechanism than the provision as revised. In particular, the previous language specified that parties may not waive a judge's participation in the face of personal bias or prejudice and that the waiver must be made out of the presence of the judge. I cannot think of a single justification for asking parties to waive a judge's *actual* bias and believe that the draftsman of the revised provision inadvertently omitted this language from the current rule in attempting to restate it. Therefore, I would retain the current language in the rule.

5

I have indicated in redline my proposed amendments to the rule as it appears in the Court's November 25, 2009 order (as amended with the Court's December 3, 2009 order).

## THE NOVEMBER 25, 2009 ORDER (AS AMENDED DECEMBER 3, 2009) WITH JUSTICE YOUNG'S PROPOSED AMENDMENTS

### Rule 2.003    Disqualification of Judge

(A)    Applicability. This rule applies to all judges, including justices of the Michigan Supreme Court, unless a specific provision is stated to apply only to judges of a certain court. The word "judge" includes a justice of the Michigan Supreme Court.

(B)    Who May Raise. A party may raise the issue of a judge's disqualification by motion or the judge may raise it. Any justice on the Supreme Court may raise the issue of another justice's disqualification when grounds in a particular case become known.

(C)    Grounds.

(1)    Disqualification of a judge is warranted for reasons that include, but are not limited to, the following:

(a)    The judge is biased or prejudiced for or against a party or attorney.

(b)    The judge, based on objective and reasonable perceptions, has ~~either (i)~~ a serious risk of actual bias impacting the due process rights of a party when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent, as enunciated in *Caperton v Massey*, ___ US ___ (2009).

(c)    The judge, based on objective and reasonable perceptions, ~~or (ii)~~ has failed to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct. Recusal shall not be required under this section based on a judge's

6

campaign speech protected by *Republican Party of Minnesota v White*, 536 US 765 (2002).

(ed) The judge has personal knowledge of disputed evidentiary facts concerning the proceeding.

(de) The judge has been consulted or employed as an attorney in the matter in controversy.

(ef) The judge was a partner of a party, attorney for a party, or a member of a law firm representing a party within the preceding two years.

(fg) The judge knows that he or she, individually or as a fiduciary, or the judge's spouse, parent, or child wherever residing, or any other member of the judge's family residing in the judge's household, has more than a de minimis economic interest in the subject matter in controversy that could be substantially impacted by the proceeding.

(gh) The judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) is a party to the proceeding, or an officer, director or trustee of a party;

(ii) is acting as a lawyer in the proceeding;

(iii) is known by the judge to have a more than a de minimis interest that could be substantially affected by the proceeding; or

(iv) is to the judge's knowledge likely to be a material witness in the proceeding.

(2) Disqualification Not Warranted.

(a) A judge is not disqualified merely because the judge's former law clerk is an attorney of record for a party in an action that is before the judge or is associated with a law firm representing a party in an action that is before the judge.

(b) A judge is not disqualified based solely upon campaign speech protected by *Republican Party of Minn v White*, 536 US 765 (2002), so long as such speech does not demonstrate bias or prejudice or an appearance of bias or prejudice for or against a party or an attorney involved in the action.

7

      (b)(c)  A judge shall not be subject to disqualification based solely on the agreement of the parties.

(D)    Procedure.

    (1) *Time for Filing in the Trial Courts.* For motions in the trial court, tTo avoid delaying trial and inconveniencing witnesses, alla motions to for disqualificationy must be filed within 14 days after of the moving party discoverys of the grounds for disqualification. If the discovery is made within 14 days of the trial date, the motion must be made forthwith. If a motion is not timely filed, untimeliness, including delay in waiving jury trial, is a factor in deciding whether the motion should be granted.

    (2) *Time for Filing in the Court of Appeals.* All motions for disqualification must be filed within 14 days of disclosure of the judges' assignment to the case or within 14 days of the discovery of the grounds for disqualification. If a party discovers the grounds for disqualification within 14 days before a scheduled oral argument or argument on the application for leave to appeal, the motion must be made forthwith.

    (3) *Time for Filing in the Supreme Court.* If an appellant is aware of grounds for disqualification of a justice, the appellant must file a motion to disqualify with the application for leave to appeal. All other motions must be filed within 28 days after the filing of the application for leave to appeal or within 28 days of the discovery of the grounds for disqualification. If a party discovers the grounds for disqualification within 28 days of a scheduled oral argument or argument on the application for leave to appeal, the motion must be made forthwith.

    All requests for review by the entire Court pursuant to subsection (3)(b) must be made within 14 days of the entry of the decision by the individual justice.

    If a justice is aware of grounds for disqualification of another justice, the justice must raise the question before the order to enter date. Otherwise, a justice must raise the issue within 28 days after the justice discovers or should have discovered the grounds for disqualification. If a justice discovers the grounds for disqualification within 28 days of a scheduled oral argument or argument on the application for leave to appeal, the issue must be raised forthwith.

    (1)(4) *Untimely Motions.* If a motion is not timely filed in the trial court, the Court of Appeals, or the Supreme Court, untimeliness, including delay in waiving jury trial, is a factor in deciding whether the motion should be granted. No judge shall consider a motion filed after an order resolving the case has been entered.

8

(52) *All Grounds to be Included; Affidavit.* In any motion under this rule, the moving party must include all grounds for disqualification that are known at the time the motion is filed. An affidavit must accompany the motion.

(63) *Ruling.*

(a) For courts other than the Supreme Court, the challenged judge shall decide the motion. If the challenged judge denies the motion,

(i) in a court having two or more judges, on the request of a party, the challenged judge shall refer the motion to the chief judge, who shall decide the motion de novo;

(ii) in a single-judge court, or if the challenged judge is the chief judge, on the request of a party, the challenged judge shall refer the motion to the state court administrator for assignment to another judge, who shall decide the motion de novo.

(b) In the Supreme Court, if a justice's participation in a case is challenged by a written motion or if the issue of participation is raised by the justice himself or herself or another justice, the challenged justice shall decide the issue and publish his or her reasons about whether to participate. If the challenged justice denies the motion for disqualification, a party may move for the motion to be decided by the entire Court.

(i) The entire Court, including the justice who is the subject of the appeal and any other justice whose participation is challenged in the case, except a justice removed pursuant to subsection (iii), shall then decide the motion for disqualification de novo. In deciding the motion for disqualification, the Court shall be limited to the grounds raised in the motion itself. The Court's decision shall include the reasons for its grant or denial of the motion for disqualification. A justice may only be disqualified from a case upon the vote of a majority of all justices on the Court. The Court shall issue a written order containing a statement of reasons for its grant or denial of the motion for disqualification. Any concurring or dissenting statements shall be in writing, including that of the challenged justice.

(ii) Upon motion by a justice, the Court shall conduct an evidentiary hearing, governed by the Michigan Court Rules and the Michigan Rules of Evidence, to determine any

9

material facts necessary to the resolution of the motion for disqualification. Any appeal on the motion for disqualification decided by the entire Court, including any evidentiary hearing, must be made in an open session of the Court. The challenged justice may retain counsel and file a brief in response to the motion to appeal denial of disqualification. The responsive brief must be filed and served within 21 days after the party moving for disqualification appeals the justice's decision to deny the motion for disqualification.

(i)(iii) Any appeal on the motion for disqualification must be resolved by a neutral arbiter following the Michigan Court Rules and the Michigan Rules of Evidence. The justice may challenge the participation of any justice to hear an appeal on the motion for disqualification by indicating the basis for any such disqualification of any other justice sitting on the appeal. Such claim of disqualification of a justice is subject to the procedures contained in this rule and shall be resolved in accordance with the appropriate substantive rules for disqualification prior to any decision on the appeal of the original motion for disqualification.

(74) *If Disqualification Motion Is Granted.*

(a) For courts other than the Supreme Court, when a judge is disqualified, the action must be assigned to another judge of the same court, or, if one is not available, the state court administrator shall assign another judge.

(b) In the Supreme Court, when a justice is disqualified, the underlying action will be decided by the remaining justices of the Court.

(E) Waiver of Disqualification. If it appears that there may be grounds for disqualification, the judge may ask the parties and their lawyers to consider, out of the presence of the judge, whether to waive disqualification. If, following disclosure of any basis for disqualification other than personal bias or prejudice concerning a party, the parties without participation by the judge, all agree that the judge should not be disqualified, and the judge is then willing to participate, the judge may participate in the proceedings. The agreement shall be in writing or placed on the record. Parties to the proceeding may waive disqualification even where it appears that there may be grounds for disqualification of the judge. Such waiver may occur whether the grounds for disqualification were raised by a party or by the judge, so long as the judge is willing to participate. Any agreement to waive disqualification must be made by all parties to the litigation and shall be in writing or placed on the record.

10